380 A.2d 1238

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Walter HALL, Jr., Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 29, 1977.

Decided Dec. 24, 1977.

Larry P. Gaitens, Lucchino, Gaitens & Hough, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Charles W. Johns, Asst. Dist. Attys., Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POM-EROY, MANDERINO and PACKEL, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Walter Hall, Jr., was indicted for possession of a controlled substance and for possession of a controlled substance with intent to deliver in violation of the Act of April 14, 1972, P.L. 233, 35 P.S. Section 780–101 *et seq.* He filed a pretrial motion to suppress the evidence of the contraband he allegedly possessed. Following an evidentiary hearing, the trial court granted the motion. The Commonwealth appealed to the Superior Court which reversed the order of the trial court. We granted Hall's petition for allowance of appeal.

The facts as established by the testimony at the suppression hearing are these:

At approximately 8:45 p.m. on October 3, 1974, three police officers of the City of Pittsburgh, Terrance O'Leary, Joseph Joiner and Greg Edwards, in civilian dress, were patrolling in an unmarked automobile in the 600 block of Herron Avenue, Pittsburgh, an area where narcotic transactions frequently occur. They observed three individuals on the sidewalk near a tavern. The officers made a U-turn some twenty-five feet beyond the bar at an intersection where there was a break in an island dividing the avenue. The officers then double-parked the automobile[1] and exited the vehicle "with the intention to confront the [three] individuals." As the officers approached and were about ten (10) feet from the individuals, one of them (Hall) was observed reaching into his pocket and dropping "a white Kleenex ball to the ground." At the same time, Hall began

---

1. While the suppression court made no specific findings with regard to the police double-parking, the record establishes that other vehicles were so parked and that no parking spaces were available. While we do not pass on the propriety of having done so, and while we confine our considerations to the facts of record, we observe that the Superior Court noted double-parking was a common occurrence in this area of Pittsburgh.

to cross the avenue where he joined two other individuals standing in front of a second tavern.[2]

As Hall walked away, Officer O'Leary said "[h]e dropped something" and proceeded to pick up the ball. Officers Joiner and Edwards followed Hall across the street. O'Leary examined the ball and its content, and formulated a belief that the content was heroin.[3] He then "yelled" to Joiner and Edwards, who were now on the other side of the street and within two feet of Hall, that Hall had dropped heroin and to arrest him. Hall was placed under arrest and searched. The search resulted in finding marijuana in his right vest pocket. All of the events between the arrival of the police on the scene and the arrest occurred within "a matter of seconds."

The suppression court reasoned the abandonment of the evidence was caused by "coercive action" of the police. It stated: "[h]ere, without any probable cause, three police officers surround[ed] and follow[ed Hall], in effect, illegally restricting his freedom by their threatening actions." Accordingly, it ruled *Commonwealth v. Jeffries*, 454 Pa. 320, 311 A.2d 914 (1973), was controlling and suppressed the evidence of the heroin and marijuana.

The Superior Court reversed. Essentially, that court ruled no unlawful or coercive police conduct occurred prior to the narcotics being abandoned, and thus *Commonwealth v. Jeffries*, supra, was inapposite. It also stated: " . . . the narcotics were dropped even before the police had approached [Hall]." *Commonwealth v. Hall*, 240 Pa.Super. 89, 91, 367 A.2d 724, 725 (1976).

Judge Spaeth filed a dissenting opinion, in which Judge Hoffman joined, which stated the majority of the Superior

2. The two individuals with whom Hall was initially observed also walked away. There is nothing in the record to indicate or suggest that the police officers attempted to restrain Hall or his companions before Hall dropped the kleenex.

3. O'Leary opened the kleenex and found four silver foil packets. He opened one and observed a white powder. He then "yelled . . . that it was stuff," which he explained meant heroin.

Court had ignored the suppression court's finding of fact, namely that the " 'three police officers surround[ed] and follow[ed] the defendant, in effect, illegally restricting his freedom by their threatening actions' " and that "this 'coercion of the police officers who confronted the three males on pure speculation and without any probable cause' . . . caused the abandonment of the heroin." *Commonwealth v. Hall,* supra, 240 Pa.Super. at 92, 367 A.2d 726 quoting from the opinion of the suppression court.

Appellate courts are bound by the factual findings of the suppression court if they have support in the record, see *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth v. Sharpe,* 449 Pa. 35, 296 A.2d 519 (1972), and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Tucker,* 461 Pa. 191, 335 A.2d 704 (1975); *Commonwealth v. Goodwin,* 460 Pa. 516, 333 A.2d 892 (1975). Clearly the Superior Court's account of the facts, that " . . . the narcotics were dropped even before the police had approached [Hall]," is at variance with that of the suppression court as the dissenting opinion points out, but the record does not support the suppression court's finding. There is no testimony in the record to support a finding that the police officers "surrounded" Hall or in any manner restricted his freedom prior to his abandoning the heroin or even prior to his arrest.[4] On the other hand, the record does not support the statement of the Superior Court that the narcotics were dropped before the police approached Hall.[5] However, after accepting all of

4. No evidence indicates Hall was "surrounded"; rather, it shows the three officers approached Hall and were within some ten to fifteen feet of him when he reached and dropped the heroin and began to walk away.

5. For instance, Officer O'Leary stated during direct examination: "We went up and made the loop around the island, came down and double-parked our automobile. Got out of the automobile and got on the sidewalk and we started walking down, and I observed Mr. Walter Hall taking something out of his right vest pocket, put it into his left hand, throw it to the ground."
During cross-examination of O'Leary, the following occurred:

the facts found by the suppression court with the exception of that not supported by the record as explained before, we are persuaded the final result reached by the Superior Court is correct and therefore affirm.

As we stated in *Commonwealth v. Jeffries*, supra, 454 Pa. at 326, 311 A.2d at 918, quoting from *Commonwealth v. Pollard*, 450 Pa. 138, 143, 299 A.2d 233, 236 (1973):

> " 'Although abandoned property may normally be obtained and used for evidentiary purposes by the police, such property may not be utilized where the abandonment is coerced by unlawful police action.' "

In *Jeffries*, supra, we ruled the abandonment of the challenged evidence had been coerced by unlawful police action and hence, the evidence could not be used for evidentiary purposes. There the accused was walking along a public street when a police patrol car approached. Upon seeing the police car, Jeffries quickened his pace. An officer exited from the police vehicle and started to chase him. When the officer caught up with Jeffries, he was seized and the police then proceeded to retrieve a package Jeffries dropped during the chase. It was later ascertained this contained heroin.

The act of chasing Jeffries in order to seize him was illegal and coercive police action because of the absence of "unusual or suspicious conduct" to permit the police to "reasonably conclude that criminal activity may [have been] afoot," *Commonwealth v. Berrios*, 437 Pa. 338, 340, 263 A.2d 342, 343 (1970), *and* because the circumstances clearly demonstrated that the police officer was exercising force, i.e., showing authority, sufficient to warrant a conclusion by "a reasonable man, innocent of any crime," that the officer was

"Q. In other words, as you approached, he wasn't standing still and dropped this and then started to walk? In fact, as you approached he started to walk away and you walked after him. "A. *As I approached Mr. Hall, he went to his right vest pocket and took out a white ball, placed it in his left hand. He was moving and threw it to the ground. I walked down and retrieved it.*" [Emphasis added.]

attempting to effectuate a "forcible stop" as opposed to a mere "contact." *Commonwealth v. Jones*, 474 Pa. 364, 374, 378 A.2d 835, 840 (1977). See *Terry v. Ohio*, 392 U.S. 1, 32, 88 S.Ct. 1868, 1885, 20 L.Ed.2d 889 (1968) (Harlan J., Concurring).

Since instantly the officers did not have any basis to justify a conclusion that criminal activity may have been afoot, the determinative inquiry is whether, prior to the abandonment, the officers exercised sufficient force, i.e., show of authority, to warrant a reasonable man, innocent of any crime, to conclude they were attempting a forcible stop. Based on the facts presented, we must conclude the officers did not do so. Instantly, the plain-clothes officers merely double-parked the unmarked automobile and approached Hall and two other individuals on the street prior to the abandonment occurring. Assuming that double-parking and the manner in which the officers got out of the car and approached Hall would justify a conclusion by a reasonable man, innocent of any crime, that they were police officers, this alone could not justify a conclusion that they were attempting a "forcible stop." " 'There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.' " *Commonwealth v. Jones*, supra, 474 Pa. at 370, 378 A.2d at 838, quoting from *Terry v. Ohio*, supra at 34, 88 S.Ct. at 1886 (White, J., Concurring). *A fortiori*, a policeman may approach a citizen on the streets in order to put himself in a position to address those questions to the citizen. See *Commonwealth v. Horsley*, 244 Pa.Super. 91, 366 A.2d 930 (1977); *United States v. Embry*, 546 F.2d 552 (3rd Cir. 1976).

Order affirmed.

MANDERINO, J., filed a dissenting opinion.

NIX, J., did not participate in the consideration or decision of this case.

MANDERINO, Justice, dissenting.

I dissent. The Court today holds that police officers may, on no more than the faintest suspicion, openly confront citizens in order to investigate possible criminal conduct, and absent some overt show of authority, such as a brandished weapon or a command to freeze, the Fourth Amendment is not relevant in assessing the legality of the police activity. Today's decision not only runs afoul of the United States Supreme Court's major pronouncements on investigatory stops, but seriously debilitates Fourth Amendment rights heretofore selfishly guarded by this Court.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that on-the-street frisks for weapons by the police must meet Fourth Amendment standards, but that the officer need not have probable cause to arrest before undertaking this carefully circumscribed intrusion into a citizen's privacy. *See Commonwealth v. Pinney,* 474 Pa. 210, ——, 378 A.2d 293, 296 (1977), and cases cited therein. *Terry,* however, avoided the question of the constitutionality of the initial stop, assuming that so long as the individual did not resist detention, or the police officer was not forced to exert his authority in any way, the initial stop was not a seizure within the meaning of the Fourteenth Amendment. 392 U.S. at 19, n. 16, 88 S.Ct. 1879, n. 16, 20 L.Ed.2d at 905, n. 16; *id.* at 32–33, 88 S.Ct. at 1885, 20 L.Ed.2d at 912–13 (Harlan, J., concurring). *See The Supreme Court,* 1971 Term, 86 Harv.L.Rev. 171–77 (1972).

In *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court recognized that *any* on-the-street investigatory stop by the police is a forcible stop; *i. e.,* a "seizure," subject to Fourth Amendment limitations. *Adams* held that police may stop a suspicious individual *when the officer reasonably believes that the individual may be engaged in criminal activity* and when the exigencies of the situation such as the need to momentarily freeze the situation or ascertain the suspect's identity, justify the stop.

Under *Adams,* it was illegal for these police officers to forcibly stop appellant. Appellant was merely walking down the street—completely innocent behavior—and could harbor a perfectly legitimate expectation to be let alone. If the Fourth Amendment means anything, it is that our society puts a premium on the sanctity of individual freedom and security in the face of unwarranted government encroachments.

The majority concludes that there was no forcible stop here by straining reality, and by rejecting the trial court's determination that these officers, in effect, "surrounded" appellant immediately preceding his dropping of the contraband.

These officers made a "U-turn" a mere twenty-five feet beyond where appellant was standing, and immediately double parked their car, "with the intention to confront" appellant and his companions. Even assuming that at this point appellant did not know or suspect that these men were law enforcement officers, the fact that three men pull up in and exit a car "with the intent to confront" three other individuals, and do so in the manner in which the police officers here confronted appellant, would cause a reasonable person in appellant's position to believe that he should not walk away, but should submit to any forthcoming questions these persons might have. I have no doubt that an innocent citizen would feel that his freedom to walk away was being restrained if these men approached as they did here within ten feet of the individual.

I therefore think it wholly unrealistic to conclude, as does the majority, that these officers were not effectuating a forcible stop of appellant. The officers were doing precisely that, and since they had absolutely no grounds for accosting this individual, the stop was illegal. In this Commonwealth, the primary responsibility and duty of giving force and effect to constitutional liberties lies with this Court. I think we abdicate that responsibility when we allow citizens to be

stopped and searched at the whim of police officers who have only a slight suspicion of improper conduct.