582 A.2d 1058

**In the Interest of Kathleen JERMAINE.**

**Appeal of COMMONWEALTH.**

Superior Court of Pennsylvania.

Argued March 29, 1990.

Filed Oct. 22, 1990.

Reargument Denied Dec. 20, 1990.

504

Bradley Bridge, Asst. Public Defender, Philadelphia, for appellee.

Deborah Fleisher, Asst. Dist. Atty., Philadelphia, for Com., appellant.

Before WIEAND, BECK and POPOVICH, JJ.

WIEAND, Judge:

Where a police officer, without show of force, approaches a juvenile in a public railroad station and asks her questions and she, without coercion, consents to a search of the bag which she is carrying, are the drugs found in her bag subject to suppression as the fruits of unlawful police conduct? The trial court held that the juvenile, because of her youth, "was not of an age where consent was freely given" and suppressed the drugs found in her bag. After careful review, we reverse.

In reviewing an appeal taken by the Commonwealth from an order suppressing evidence,

> we must consider only the evidence of the defendant's witnesses and so much of the Commonwealth evidence that, read in the context of the record as a whole, remains uncontradicted. *See Commonwealth v. Hamlin,* 503 Pa. 210, 469 A.2d 137 (1983). Furthermore, our scope of appellate review is limited primarily to questions of law. *See Commonwealth v. White,* 358 Pa.Super. 120, 516 A.2d 1211 (1986). We are bound by the suppression court's findings of fact if those findings are supported by the record. *Id.* Factual findings wholly lacking in evidence, however, may be rejected. *Id.*

*Commonwealth v. Stine,* 372 Pa.Super. 312, 314, 539 A.2d 454, 455 (1988). See also: *Commonwealth v. James,* 506 Pa. 526, 532–533, 486 A.2d 376, 379 (1985); *Commonwealth v. Elliott,* 376 Pa.Super. 536, 543, 546 A.2d 654, 657 (1988).

The only testimony at the suppression hearing was elicited from Ronald Bason, an Amtrak Police Officer. He said that on February 8, 1989, at or about 4:25 p.m., he had received information from Sergeant Ulrach, an Amtrak Narcotics Officer at Penn Station, in New York City, that a young female suspected of carrying narcotics, had boarded a train bound for Philadelphia's 30th Street Station. The suspect was described as "a black female, approximately eighteen (18) to twenty-three (23) years old, one hundred

twenty (120) pounds, 5'7", black medium length kinky hair, wearing a blue jean jacket, blue jean coat, black sneakers[,] ... a brown muslim type cap, carrying a black shoulder bag, and a white paper bag." The basis for Ulrach's suspicion was repeated by Bason as follows:

Officer Ulrach relayed to me he observed this individual at Penn Station, New York purchase a one-way ticket to 30th Street with cash. This individual then waited for the second call of the train before boarding.

Officer Ulrach told me this individual appeared to be nervous and concerned with his presence when she appeared to notice him standing there.

This individual then got up and walked to the train with Officer Ulrach following behind. As she was walking, she constantly kept looking over her shoulder at Officer Ulrach until she boarded the train. Upon sitting herself in the train, Officer Ulrach walked through the same car of the train which she was in. She remained in constant contact, eye contact, with him. Officer Ulrach exited the train and stood on the platform and positioned himself to her rear.

At that time, he observed her make a noticeable effort to keep eye contact with him.

When the train arrived at the 30th Street Station at 5:09 p.m., Bason, who was in plain clothes, was able to identify the suspect as she walked through the concourse. She was constantly looking around her and appeared to be very nervous. As she approached the Market Street exit, Bason, together with a second officer, walked up to her, identified himself as a police officer and asked if he could speak with her. He described the subsequent events as follows:

She said, "Yeah." I then asked her, "Did you just come in on a train," and she said, "Yeah."

I asked her, "Can I ask you where you came from," and she said, "New York." I asked her, "Do you have a train ticket or a receipt," and she said, "No." I asked her if she had any identification and she said no. I asked her what her name was and she said Kathleen Jermaine.

At this point she said, "Can you tell me why you're stopping me because I did not do nothing." At that time I informed her that I was a part of the Narcotics Interdiction Team, a team that was going to stop the flow of narcotics in Philadelphia by way of Amtrak trains.

I asked her, "Would you give me consent to search your bag," and she just looked at me and she was also trembling very nervously. She did not say anything.

I then asked her again, "Miss, would you give me consent to search your bag." She put her head down and said, "Yes," and handed me her bag. At that point I opened the bag and I found a brown paper bag. Upon opening the brown paper bag, there was a plastic bag which contained a large amount of white powdery substance, whcch [sic] also was in the form of chunks.

Through my experience, I recognized this as possibly being cocaine.

I advised the defendant that she was under arrest. During Bason's conversation with the girl, the second officer, who was also in plain clothes, stood about seven feet behind the girl.

■ The suppression court, in its opinion suppressing the contraband, reasoned that the police had lacked "reasonable suspicion" to believe that Jermaine was transporting drugs and that the stop, therefore, was unlawful. After the Commonwealth requested reconsideration of the court's initial suppression order, the court concluded that the juvenile's apparent consent to a search of her bag had been vitiated by her youth and the presence of the police. The Commonwealth, on appeal,[1] argues that the encounter between Bason and Jermaine did not rise to an investigatory stop and did not implicate the juvenile's Fourth Amendment rights. However, even if it did amount to an investigatory

1. The Commonwealth may appeal from a trial court's order suppressing evidence when it certifies in good faith that the suppression order will terminate or substantially handicap its prosecution of the case. See: *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985). In the instant case, it is clear that the suppression ordcr will substantially handicap the Commonwealth's prosecution.

stop, the Commonwealth argues, Jermaine voluntarily consented to the search of her bag.

Not every encounter between a citizen and the police is so intrusive as to trigger the protections provided by the Fourth Amendment to the United States Constitution. See: *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Commonwealth v. Douglass*, 372 Pa.Super. 227, 238, 539 A.2d 412, 417 (1988). There is nothing in the Constitution which prevents a policeman from approaching a person on a public street or in a public place in order to make inquiries of that person. *Commonwealth v. Brown*, 388 Pa.Super. 187, 190, 565 A.2d 177, 178 (1989). See also: *Terry v. Ohio, supra* at 34, 88 S.Ct. at 1886, 20 L.Ed.2d at 913 (White, J. concurring); *Commonwealth v. Hall*, 475 Pa. 482, 488, 380 A.2d 1238, 1241–1242 (1977); *Commonwealth v. Jones*, 474 Pa. 364, 370, 378 A.2d 835, 838 (1977); *Commonwealth v. Williams*, 298 Pa.Super. 466, 469, 444 A.2d 1278, 1279 (1982). "A seizure of a person sufficient to trigger the protections of the Fourth Amendment occurs 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.'" *Commonwealth v. Ellis*, 379 Pa.Super. 337, 354, 549 A.2d 1323, 1331 (1988), quoting *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 572 (1988). See also: *INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247, 255 (1984); *Commonwealth v. Jones, supra* 474 Pa. at 372–373, 378 A.2d at 840; *Commonwealth v. Williams, supra* 298 Pa. Super. at 469–470, 444 A.2d at 1279. Factors to be considered in determining whether an encounter with police rises to the level of a seizure of the person include "whether the officer makes a show of authority or exercises force, the officer's demeanor and manner of expression, the location, and the content of any interrogatories or statements are relevant to the determination." *Commonwealth v. Williams, supra*, 298 Pa.Superior Ct. at 470, 444 A.2d at 1279. See also: *Commonwealth v. Jones, supra* 474 Pa. at 371–372, 378 A.2d at 838–840.

The United States Supreme Court has elaborated on the difference between a "mere encounter" and a seizure of the person which implicates the Fourth Amendment in the following manner:

We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez–Fuerte,* 428 U.S. 543, 554, 49 L.Ed.2d 1116, 96 S.Ct. 3074 [3081 (1976)]. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

Moreover, characterizing every street encounter between a citizen and the police as a "seizure," while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes v. Washington,* 373 U.S. 503, 515, [10 L.Ed.2d 513, 83 S.Ct. 1336, 1344 (1963)]." *Schneckloth v. Bustamonte,* 412 U.S. [218], at 225, 36 L.Ed.2d 854, 93 S.Ct. 2041 [2046 (1973)].

We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all

of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See *Terry v Ohio*, supra, at 19, n 16, 20 L Ed 2d 889, 88 S Ct 1868 [1879 n. 16], 44 Ohio Ops 2d 383; *Dunaway v New York*, 442 US 200, 207, and n 6, 60 L Ed 2d 824, 99 S Ct 2248 [2253, and n. 6 (1979)]; 3 W. LaFave, Search and Seizure 53–55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*United States v. Mendenhall*, 446 U.S. 544, 553–555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509–510 (1980) (Opinion Announcing Judgment of the Court per Stewart, J.) (footnote omitted). See also: *Michigan v. Chesternut, supra* 486 U.S. at 573–574, 108 S.Ct. at 1979–1980, 100 L.Ed.2d at 571–572; *INS v. Delgado, supra* 466 U.S. at 215–217, 104 S.Ct. at 1762–1763, 80 L.Ed.2d at 254–255; *Florida v. Royer*, 460 U.S. 491, 497–498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983) (Opinion Announcing Judgment of the Court per White, J.); 3 LaFave, Search and Seizure, § 9.2(h) (2d ed. 1987). The Supreme Court has also observed that

police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Cf. *Schneckloth v. Bustamonte*, 412 US 218, 231–234, 36 L Ed 2d 854, 93 S Ct 2041 [2049–2051] (1973). Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have be-

lieved he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps ... to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure. *United States v. Mendenhall,* 446 U.S., at 554, 64 L.Ed.2d 497, 100 S.Ct. 1870 [1877]; see *Terry v. Ohio,* 392 U.S., at 21, 20 L.Ed.2d 889, 88 S.Ct. 1868 [1879], 44 Ohio Ops.2d 383.

*INS v. Delgado, supra* 466 U.S. at 216–217, 104 S.Ct. at 1762–1763, 80 L.Ed.2d at 255. See, e.g.: *United States v. Garcia,* 866 F.2d 147 (6th Cir.1989) (airport confrontation did not amount to seizure where police did not touch defendant, did not display weapons and did not raise voices or threaten defendant in any way); *United States v. $25,000 U.S. Currency,* 853 F.2d 1501 (9th Cir.1988) (encounter at airport not a seizure where police merely approached defendant, identified themselves, and asked him for identification and consent to search his bag); *Gomez v. Turner,* 672 F.2d 134 (D.C.Cir.1982) (mere status of police officer as figure of governmental authority does not, standing alone, constitute sufficient show of authority to transform encounter into seizure).

In analyzing Supreme Court decisions, LaFave has commented:

[A]n officer has not made a seizure if, for example, he interrogated "in a conversational manner," "did not order the defendant" to do something or "demand that he" do it, did not ask questions which were "overbearing or harassing in nature," and did not "make any threats or draw a weapon." Even physical contact is acceptable if it is "a normal means of attracting a person's attention." On the other hand, an encounter becomes a seizure if the officer engages in conduct which a reasonable man would view as threatening or offensive even if performed by another private citizen. This would include such tactics

as pursuing a person who has attempted to terminate the contact by departing, calling to such a person to halt, holding a person's identification papers or other property, blocking the path of the suspect, physically grabbing and moving the suspect, and encircling the suspect by many officers....

"Offensive statements," such as "unsupported outright accusations of criminal activity or suggestions that an innocent person would be willing to relinquish constitutional rights, are not irrelevant" in such an analysis. Indeed, it may be true in a more general sense that the subject matter of the conversation which ensues has some bearing upon whether it may be said that the person was subjected to a Fourth Amendment seizure. But this is not to say ... that "Fourth Amendment rights are implicated" whenever "the individual is stopped or detained because the officer suspects he may be personally involved in some criminal activity," but not when "the officer acts for other proper reasons."

3 W. LaFave, Search and Seizure, § 9.2(h) at pp. 412–415 and supp. p. 36 (2d ed. 1987 and 1990 Supplement) (footnotes omitted).

Under circumstances similar to those in the instant case, the Court of Appeals for the Third Circuit, in *United States v. Thame*, 846 F.2d 200 (1988), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988), held that a police officer's non-threatening conversation with a suspect in the lobby of a train station had not risen to the level of an investigatory stop prior to the suspect's giving consent to a canine sniff of his luggage. The defendant had traveled from Fort Lauderdale, Florida, to Philadelphia by train, where agents had been alerted by others in Florida that the suspect was believed to be carrying drugs. Upon the suspect's arrival in Philadelphia, agents approached him, asked him his name, walked with him and ultimately obtained his consent to accompany them to an office so that a dog could sniff his luggage. As a result of a sniff search, a warrant was obtained, the bag was opened, and cocaine was

found.[2]  In concluding that the defendant had not been detained unlawfully by the police, the Court reasoned that the encounter in the lobby of the train station had not ripened into a seizure of the suspect prior to his consent to the canine sniff search.  The officers had merely questioned the defendant regarding his identification, examined his train ticket and sought his consent to a search.  Moreover, the police had not physically restrained the defendant in any way, nor had they attempted to control his movement by

**2.**  These events were described in greater detail in the opinion of the Court as follows:

Philadelphia Police Officer Michael McCue, assigned to the Drug Enforcement Agency, followed Thame up from the platform to the lobby of 30th Street Station while DEA Special Agent John McCarty followed still further behind with Amtrak Investigator Doonan.  In the lobby, McCue walked alongside Thame, identified himself, and asked if he could speak with Thame.  Thame said that he did not mind.  As they continued walking, McCue asked Thame if he had just gotten off the train from Florida, and Thame said that he had.  McCue then asked Thame his name, and Thame replied "Albert Thame."  McCue then asked if he could see his train ticket.  At this point, the two stopped walking as Thame reached into his pocket and produced his train ticket, bearing the name "B. Kelly."  Thame, in response to a question from McCue, explained that he was using the ticket of a friend who had to fly back.  McCue then asked for identification, and Thame produced a driver's license and old police identification in his correct name.  Agent McCarty then joined McCue and Thame and identified himself.  McCue handed the ticket and the identification to McCarty, who looked it over and handed it back to Thame.  McCarty then explained that they were working with the Narcotics Interdiction Unit, seeking cooperation from passengers from source cities such as Miami and Fort Lauderdale, and asked if Thame would mind if McCue and McCarty looked in the luggage Thame was carrying.  Thame declined, stating that he had "sensitive material" in his bag.  McCarty replied that that was fine, that he had an absolute right to refuse, but asked whether it would be okay if they conducted the search in a more private place.  Thame again declined.  McCarty then asked whether Thame would object to a sniff search of the air around the bag by a dog, as this would be less intrusive.  Thame agreed.  McCarty then asked if Thame would mind accompanying them to the Amtrak police office, explaining that this would be more private and out of the way.  Thame carried his own bag to the office.  The entire conversation took about two minutes, and the walk to the Amtrak police office took less than a minute.  At the office, a sniff search took place, and the dog indicated that there were drugs in Thame's bag.  The sniff search was repeated in another room.  A warrant was then obtained, the bag was opened, and cocaine was found.

*United States v. Thame, supra* at 201–202.

retaining his travel documents. Under these circumstances, the Court concluded, the suspect had not been seized; and, therefore, the police were not required to have reasonable suspicion before approaching the defendant and seeking his cooperation. See also: *United States v. Alvarez–Sanchez,* 774 F.2d 1036 (11th Cir.1985) (mere fact that agent identified self as INS agent did not transform encounter with defendant into a seizure); *United States v. Notorianni,* 729 F.2d 520 (7th Cir.1984) (fact that agent told defendant he was conducting a narcotics investigation prior to asking for consent to search luggage did not make encounter a seizure); *Commonwealth v. Sanchez,* 403 Mass. 640, 531 N.E.2d 1256 (1988) (fact that policeman told defendant he was conducting drug investigation and then asked for consent to search did not make the encounter a seizure). But see: *United States v. Gonzales,* 842 F.2d 748 (5th Cir.1988).

■ The rationale of these decisions from other jurisdictions is persuasive. Applying the same rationale to the instant case, we conclude that Officer Bason's encounter with appellee did not rise to the level of a seizure of her person which invoked Fourth Amendment protections. Bason approached Jermaine and asked her if he could speak with her for a moment. There was no display of a weapon or other show of authority to suggest coercion. The record also does not disclose evidence that Bason or his companion had physically blocked appellee's path or spoken to her in a threatening manner. Rather, the evidence suggests that Bason merely identified himself as a police officer and asked appellee if she had any travel documents or identification. Although identifying himself as a part of the Narcotics Interdiction Team, Bason did not tell appellee that she was suspected of criminal activity. Under these circumstances, it is clear that Jermaine had not been seized by the police before being asked to consent to a search of her bag. Therefore, Fourth Amendment guarantees were not implicated, and the suppression court erred when it held otherwise.

■ The suppression court erred further by determining that the juvenile, because of her age and a police presence, had not voluntarily consented to the search of her bag. Because Bason merely approached the juvenile and inquired if she would answer a few questions, it cannot be said that she was faced with a threatening or coercive police presence. The fact that the juvenile was sixteen and one-half years old at the time of the search, moreover, did not prevent her from giving voluntary consent to a search of her bag. "Although age is one element to acknowledge in ascertaining whether consent was given willingly, minority status alone does not prevent one from giving consent." *Commonwealth v. Maxwell*, 505 Pa. 152, 162, 477 A.2d 1309, 1315 (1984), *cert. denied*, 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984) (consent to search house given by sixteen year old was valid where record was devoid of any evidence of emotional immaturity or mental instability and indicated to the contrary that decision was rational).

We have examined the record and have found no evidence to support a finding that Jermaine was emotionally or mentally immature so as to be incapable of giving valid consent for the police to search her bag. To believe otherwise is to discount entirely the fact that the juvenile was sufficiently mature to purchase a train ticket in New York and travel alone to Philadelphia. The fact that she did not refuse to talk with Bason, as well she might have done, does not permit a finding that she was so immature as to be unable to consent validly to a search of her handbag. When all the surrounding circumstances are considered, we are satisfied that the Commonwealth demonstrated that appellee's consent had been voluntarily given and had not been the product of duress or coercion, either express or implied. See: *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Commonwealth v. Mamon*, 449 Pa. 249, 255–256, 297 A.2d 471, 475 (1972). See also: *Commonwealth v. Markman*, 320 Pa.Super. 304, 467 A.2d 336 (1983); *Commonwealth v. Lowery*, 305 Pa.Super. 66, 74, 451 A.2d 245, 248–249 (1982).

The order suppressing the evidence seized from appellee is reversed, and the case is remanded for further proceedings. Jurisdiction is not retained.

POPOVICH, J., files a dissenting opinion.

POPOVICH, Judge, dissenting.

I respectfully dissent from the majority's conclusion that "Officer Bason's encounter with appellee did not rise to the level of a seizure of her person which invoked Fourth Amendment protections." Majority opinion, p. 1063. Rather, I am convinced that a "seizure" did occur and that the police did not possess the requisite "articulable suspicion" to justify the stop of Kathleen Jermaine.

In *United States v. Mendenhall*, 446 U.S. 544, 554–555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980), the United States Supreme Court stated:

> We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . .

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. . . .

In *Florida v. Royer*, 460 U.S. 491, 497–498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983) (plurality), the Supreme Court explained:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. (Citations omitted) Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requir-

ing some level of objective justification. (Citation omitted)

Instantly, I believe that Kathleen Jermaine was "seized" under the standards outlined in *Mendenhall* and *Royer.* Consider the facts: It is 5:30 p.m. on Wednesday, February 8, 1989, "rush-hour" at 30th Street Station in Philadelphia. Kathleen Jermaine, a juvenile who has just arrived from New York via Amtrak, is singled out of the crowded concourse by two plain clothes police officers. Officer Bason identifies himself as a police officer and asks if he may speak with her. The other officer moves to a position behind the young girl. After answering several questions, Kathleen questions, "Can you tell me why you're stopping me because I did not do nothing." To which Officer Bason responds, "I [am] a part of the Narcotics Interdiction Team, a team that [is] going to stop the flow of narcotics in Philadelphia by way of Amtrak trains." Officer Bason then asks, "Would you give me consent to search your bag?" Kathleen, trembling and very nervous, did not respond. Again Officer Bason asked, "Miss would you give me consent to search your bag." Only after the second request did Kathleen agree to the search and hand her bag to Officer Bason.

I am convinced that under the foregoing facts, a reasonable person would believe she was not free to leave. To hold otherwise would be to perpetuate the myth that a reasonable person, when confronted by police officers, actually believes she has the option of declining to listen to the officers and leaving without suffering further consequences. Although constrained to follow the judgment of the Supreme Court regarding what a reasonable person believes when confronted by a law enforcement officer, numerous Circuits of the United States Court of Appeal have recognized the artificiality of the Supreme Court's test. See *United States v. Thame,* 846 F.2d 200, 202 (3rd Cir.1988), cert. denied, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988) ("Although we have our doubts whether a reasonable person who is greeted by federal agents and

asked for identification feels free to simply ignore the agents...."); *United States v. Notorianni,* 729 F.2d 520, 522 (7th Cir.1984) ("Maybe this is a wrong guess about what the average person feels in this situation...."); *United States v. Cordell,* 723 F.2d 1283, 1286 (7th Cir.1983), cert. denied 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984) (Swygert, J., concurring) ("I believe that as a factual psychological matter people who are stopped for questioning of this kind by police officers ... generally do not feel 'free to leave'...."); see also Note, The Drug Courier Profile and Airport Stops: Reasonable Intrusions of Suspicionless Seizures?, 12 Nova L.Rev. 273, 284 (1987) (lower courts recognize "the artificiality of the test").[1] We are not so constrained and are free to use Article 1, § 8 of the Pennsylvania Constitution to guard individual privacy rights against unreasonable searches and seizures more zealously than the federal courts do under the United States Constitution. *Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989); *Commonwealth v. Beauford,* 327 Pa.Super. 253, 475 A.2d 783 (1984), allocatur denied, 508 Pa. 319, 496 A.2d 1143 (1985).

When Kathleen asked Officer Bason why she was being detained, Officer Bason told her he was part of the Narcotics Interdiction Team.[2] Thus, he implicitly informed Kathleen that she was the target of a narcotics investigation. This fact, combined with the other circumstances surround-

1. In his concurring opinion in *Mendenhall,* Mr. Justice Powell, joined by Mr. Chief Justice Burger and Mr. Justice Blackmun, stated, "For me, the question of whether the respondent in this case reasonably could have thought she was free to 'walk away' when asked by two Government agents for her driver's license and ticket is extremely close." *Mendenhall,* 446 U.S. at 560 n. 1, 100 S.Ct. at 1880 n. 1. Thus, Mr. Justice Powell appears to recognize the folly in assuming reasonable persons feel free to disregard an officer's questions and walk away.

2. I note that Officer Bason never informed Kathleen that she was free to leave in response to her question of "Can you tell me why you're stopping me ...?" This is further evidence that Kathleen did not believe she was free to go. Similarly, a reasonable person would not believe she was free to leave when after questioning the reasons for the stop, the officer did not give a responsive answer but instead informed her that he was investigating narcotics trafficking.

ing the stop of Kathleen, compels a conclusion that Kathleen was seized at the time Officer Bason revealed he was on the Narcotics Interdiction Team and requested to search her bag. Certainly, under the facts *sub judice,* a reasonable person (not to mention a juvenile) would not feel free to leave with the fear of formal detention. See *Thame,* 846 F.2d at 203 ("Statements which intimate that an investigation has focussed on a specific individual easily could induce a reasonable person to believe that failure to cooperate would only lead to formal detention."); *United States v. Gonzales,* 842 F.2d 748 (5th Cir.1988) (a statement by a law enforcement officer that an individual is suspected of illegal activity is persuasive evidence that the Fourth Amendment has been implicated); *United States v. Borys,* 766 F.2d 304, 311 (7th Cir.1985), cert. denied, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986) (same); *United States v. Berry,* 670 F.2d 583 (5th Cir.1982) (en banc) (same).

The majority asserts that Kathleen was not informed that she was a suspect of a narcotics investigation, and therefore, compares this case to *Thame, supra,* where no investigatory stop was found when an officer approached an individual, identified himself as a member of the Narcotics Interdiction Team seeking cooperation from passengers from source cities and then requested a consent search. However, the facts of *Thame, supra,* differ in two significant respects. First, the defendant in *Thame, supra,* was an ex-police officer who undoubtedly had a greater awareness of his rights than Kathleen, a juvenile. Second, Thame was informed of his absolute right to refuse to talk to the officers or consent to a search of his bags; Kathleen received no such warning. Rather, immediately after informing her of his status as a narcotics investigator, Officer Bason requested consent for a search, and, when Kathleen did not respond, he again asked. I have little doubt that an individual faced with the same circumstances would believe he or she was the suspect of a drug investigation. And, I

submit such belief is reasonable.[3]

Since I would find that Kathleen was seized within the meaning of the Fourth Amendment, I must next determine whether reasonable suspicion for the stop existed. In *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984), the Supreme Court of the United States commented:

> Certain constraints on personal liberty that constitute "seizures" for the purpose of the Fourth Amendment may nonetheless be justified even though there is no showing of "probable cause" if "there is articulable suspicion that a person has committed or is about to commit a crime." *Florida v. Royer, supra,* 460 U.S., at 498, 103 S.Ct., at 1324 (opinion of WHITE, J.). Such a temporary detention for questioning in the case of an airport search is reviewed under the lesser standard enunciated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and is permissible because of the "public interest involved in the suppression of illegal transactions in drugs or of any other serious crime." *Royer, supra,* 460 U.S. [at] 498–499, 103 S.Ct. [at] 1324–1325.

Instantly, I agree with the court below that articulable suspicion for the stop did not exist. As stated by Judge Reynolds in his opinion in support of the decision to suppress the seized evidence:

> Kathleen Jermaine, a slight 17 year-old black girl, purchased a one way ticket at Pennsylvania Station in New York City to Philadelphia (N.T. p. 4). The only suspicious conduct that the officer was able to articulate was that she appeared to be "nervous and concerned with his presence when she appeared to notice him standing there." (N.T. p.4)
>
> When the defendant went to her train, the officer followed her, *maintaining constant eye contact with her* (N.T. p. 5). This court believes that *any* young

---

**3.** One wonders how many times a day police officers stop and intrude upon the privacy rights of innocent travelers without finding contraband. One must remember cases like this only come before us when drugs are found. This fact should not be used to justify an otherwise unreasonable invasion of privacy.

woman at Penn Station in New York City who was subjected to eye to eye contact by a man in civilian clothes and then *followed* to her train would be nervous *and* watchful. (Emphasis in original.)

Once at 30th Street Station, Officer Bason has offered no evidence of suspicious action except for Kathleen's nervousness displayed once approached by the police. Certainly, the facts of this case do not rise to the level of reasonable suspicion, and the evidence seized as a result of the stop must be suppressed. Accordingly, I would affirm the suppression order of the court below.