J-A06027-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ANTOINE BLACK | |
| Appellant | No. 1316 MDA 2015 |

Appeal from the Judgment of Sentence July 6, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0000977-2014

BEFORE: LAZARUS, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED AUGUST 16, 2016**

Antoine Black appeals from the judgment of sentence imposed by the Court of Common Pleas of Dauphin County for firearm and drug-related offenses. Upon careful review, we reverse.

The trial court set forth the factual history of the case as follows:

At the suppression hearing held on November 25, 2014, the Commonwealth presented Dauphin County Adult Probation Officers ("PO") Rick Anglemeyer and Kurt Zitsch as witnesses. PO Anglemeyer was Black's supervising PO on the date of his arrest, January 9, 2014. During a routine check, PO Anglemeyer arrived at Black's approved address, 2145 N. Fifth Street, Harrisburg, Pennsylvania at approximately 1:15 p.m. Anglemeyer was accompanied by PO Zitsch when they knocked on the residence front door which was opened by a female child 3-4 years of age. The agents identified themselves and asked if Black was home. The child answered "yes" and, at the same time, another female who was approximately 20 years old appeared on the landing of the stairs and said "yeah, he's up here."

PO Anglemeyer observed Black's mother asleep on the couch in the living room and proceeded up the stairs as PO Zitsch engaged her in conversation. When PO Anglemeyer reached the bedroom, the door was ajar allowing him to see Black lying face down on his bed making hand movements. When PO Anglemeyer knocked, Black rolled over, sat up and took off his blankets to reveal that he was only wearing boxer shorts.

While PO Anglemeyer was looking around his room, he observed a Kay Jewelers box and a video console which he had not seen during prior visits. Anglemeyer stated that he found this notable because, to his knowledge, Black was not employed. Based on PO Anglemeyer's observation that he was acting nervous, he requested consent to look around the room especially given that Black admitted during a September 12, 2013 visit that he had been selling marijuana. Black gave his consent.

PO Zitsch proceeded to search a walk-in closet on the other side of the room. Near the closet, in plain view on a windowsill, Zitsch observed a digital scale with white powder residue on it and plastic sandwich baggies. He informed Anglemeyer of his discovery and, based on the findings, the POs detained him without incident.

After detaining Black, PO Anglemeyer asked him if there was any other illegal contraband in the residence to which Black replied that he had $1200 in cash in a pair of pants nearby but, it was not "illegal." However, after previously admitting to selling marijuana, a condition had been added to his probation that prohibited him from having any more than $50 on his person without validation of source. PO Zitsch checked the pants pockets but found nothing. Black then said it was in the pocket of a black coat that was hanging on the walk-in closet door. While looking for the money in the jacket pocket, PO Anglemeyer observed the corner of a plastic sandwich baggie and, upon retrieval of the bag, he discovered what he believed to be a large amount of crack cocaine. At that point in time, the Harrisburg Police were called to the scene. The police arrived with a warrant to search the residence. The search uncovered an additional baggie containing a large amount of crack cocaine, a .45 caliber handgun and $9,974 in cash in another jacket pocket.

At the suppression hearing, Black presented the testimony of his mother, Michelle Black ("Ms. Black") and testified on his own behalf relaying their version of the January 9, 2014 encounter

with POs Anglemeyer and Zitsch. Ms. Black confirmed that she had been lying on her couch when the POs arrived as she had recently had back surgery. She also confirmed that her granddaughter opened the door before she could answer it. Ms. Black said that when the door opened the men went past her and ran up the stairs as she was asking who they were and what they wanted. She acknowledged that the men said they were with probation but denied that they were given permission to go upstairs. Ms. Black was familiar with PO Anglemeyer from previous probationary home visits. Ms. Black had not seen PO Zitsch before and she denied that he stopped to speak with her upon entering the house.

Black testified to his version of his incident, as well. He stated that he was asleep on his bed when the POs knocked on the door and entered without announcing their position as probation officers. Black was not familiar with PO Zitsch but he did know PO Anglemeyer as his supervising officer. He could not recall a time when PO Anglemeyer had come up to his bedroom during a home visit.

Black said that when PO Anglemeyer entered the room he pulled off his blankets and grabbed his iPhone and proceeded to go through it. When he moved to find out if his mother had let the POs in, Black said that PO Anglemeyer told him to sit down and don't move.

Black asked PO Zitsch if he was his new PO as he said he was being reassigned. According to Black, PO Zitsch said no and then went into the bedroom closet and searched through boxes where he found a scale and plastic baggies. Black said that PO Zitsch then went through other items in the closet including a hooded sweatshirt in which he found illegal narcotics. He was handcuffed once the drugs were found and the police were called to the scene.

Black denied providing any verbal consent to search the premises. Regarding the pants searched by the POs, Black said that he said nothing to them about having $1200; rather, he asked for the pants because he was only dressed in his boxer shorts, but there might be a couple of hundred dollars in them. He also stated, in contrast to PO Anglemeyer's testimony, at the time of arrest he had been employed as a loader at Cresson Park since September.

Trial Court Opinion, 12/7/15, at 4-7 (internal citations omitted).

Black filed an omnibus pretrial motion, and a suppression hearing was held on November 25, 2014. The trial court denied the motion, and following a stipulated bench trial, Black was convicted of possession of firearms,[1] possession with intent to manufacture or deliver a controlled substance,[2] and unlawful possession of drug paraphernalia.[3] Black was sentenced to an aggregate term of 5 to 10 years' imprisonment.

On appeal, Black raises the following issue: whether under the facts set forth above, his state and federal constitutional rights were violated by the parole officers' entry into his mother's home, and their subsequent search of his person and his room without a warrant.

An appellate court's review is "limited to determining whether the record supports the findings of fact of the suppression court and whether the legal conclusions drawn from those findings are correct." *Commonwealth v. James*, 69 A.3d 180 (Pa. 2013) (citing *Commonwealth v. Briggs*, 12 A.3d 291, 320-21 (Pa. 2011)). Factual findings are binding, but legal conclusions are reviewed *de novo*. *Id.*

> A parolee has limited Fourth Amendment rights because of a diminished expectation of privacy. *Commonwealth v.*

_____

[1] 18 Pa.C.S. § 6105(a)(1).

[2] 35 Pa.C.S. § 780-113(a)(30).

[3] 35 Pa.C.S. § 780-113(a)(32).

> ***Williams***, 692 A.2d 1031, 1035 (Pa. 1997). A "parolee's signing of a parole agreement giving his parole officer permission to conduct a warrantless search does not mean either that the parole officer can conduct a search at any time and for any reason or that the parolee relinquishes his Fourth Amendment right to be free from unreasonable searches." ***Id.*** at 1036.

***Commonwealth v. Coleman***, 130 A.3d 38, 45 (Pa. Super. 2015).[4]

However, a probation officer may conduct a property search "if there is reasonable suspicion to believe that the real or other property in the possession or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision." 42 Pa.C.S. § 9912(d)(2). A probation officer may also conduct a personal search "if there is reasonable suspicion to believe that the offender possesses contraband or other evidence of violations of the conditions of supervision." 42 Pa.C.S. § 9912(d)(1)(i).

It is clear from the record below that Black was serving a sentence of probation, and that POs Anglemeyer and Zitsch did not have a search warrant when they came to Black's mother's house for a routine home check. Therefore, they first needed to obtain consent to enter the house. PO Anglemeyer testified that a young girl "[a]pproximately three, four years of age" answered the door when they first arrived. N.T. Suppression

---

[4] The constitutional rights of a probationer are indistinguishable from those of a parolee. ***See Williams***, ***supra***. Accordingly, although we refer to cases involving both probation and parole, the underlying principles are the same.

Hearing, 11/25/14, at 5-6. Upon asking if Black was home, PO Anglemeyer said that "[a]t that point not only she answered, but another older female, approximately maybe 20 years of age, was standing on the landing of the stairs in clear view of myself, said, yeah, he's up here." *Id*. The POs took both confirmations of Black's presence in the house as consent, and they entered the home and went upstairs to Black's private bedroom. *Id.* However, as explained herein, we conclude that neither individual's consent was valid.

With regard to the 3- to 4- year-old girl, our Supreme Court has held that "[a]lthough age is one element to acknowledge in ascertaining whether consent was given willingly, minority status alone does not prevent one from giving consent." *Commonwealth v. Maxwell*, 477 A.2d 1309, 1315 (Pa. 1984). While age is one consideration in the totality of the circumstances determining the validity of a minor's consent, maturity and authority are also important factors. *Compare In the Interest of Jermaine*, 582 A.2d 1058, 1064 (Pa. Super. 1990) (16½-year-old juvenile was sufficiently mature to voluntarily consent to search of her bag), *with Commonwealth v. Garcia*, 387 A.2d 46, 55 (Pa. 1978) (16-year-old daughter did not have equal dominion over home with her mother. "The [mother] had the power to determine the extent of her daughter's authority to admit people to the house and therefore her consent was ineffective.")

Other states have held that all children under a specific age lack both the maturity and the authority to consent to a search of a parent's home.

- 6 -

*Davis v. State*, 422 S.E.2d 546 (Ga. 1992). In holding that a 10 year-old child could not give valid consent, the Georgia Supreme Court stated that "[t]he younger a child the less likely that he or she can be said to have the minimal discretion required to validly consent to a search, much less waive important constitutional rights." *Id.* at 550.

In the case *sub judice*, the totality of the circumstances indicates that the young child could not give valid consent. If the 16-year-old daughter in *Garcia, supra* did not have the authority to consent, and the 10-year-old son in *Davis, supra* was not mature enough to consent, it defies logic that a 3- to 4-year-old child could consent to search the house. Additionally, while it is possible for a homeowner to leave a child in charge during his or her absence, *see State of Iowa v. Folkens*, 281 N.W.2d 1 (Iowa 1979) (14-year-old son in charge of house while mother was absent gave legal consent), in this case Black's mother, the child's grandmother, was on the couch in the adjacent room. As such, any potential consent given by the child was overridden by the lack of consent by Black's mother.

In light of the cases cited above and common experience with respect to the maturity level of young children, we conclude that a 3- to 4-year-old child lacks the capacity to grant permission to search a residence.

We further conclude that the unidentified 20-year-old woman on the landing of the stairs did not have apparent authority to consent to POs Anglemeyer and Zitsch to enter the home. The Pennsylvania Supreme Court has held that "[t]hird party consent is valid when police reasonably believe a

third party has authority to consent." ***Commonwealth v. Strader***, 931 A.2d 630, 634 (Pa. 2007) (citing ***United States v. Matlock***, 415 U.S. 164, 171 (1974)). The exception turns on whether, given the available facts, a person of reasonable caution would believe the third party has authority over the premises. ***Id.*** The determination of apparent authority must be based on the totality of the circumstances, and if it is ambiguous whether the third party has apparent authority, "a police officer should make further inquiries to determine the status of the consenting party." ***Commonwealth v. Blair***, 575 A.2d 593, 598 (Pa. Super. 1990).

In ***Strader***, ***supra***, parole officers received a tip that Cecil Shields, a parole absconder with an active warrant, was residing at an apartment in Wilkinsburg. The parole agent provided the tip to a detective, who went to the apartment along with other officers. From prior contacts, the detective knew that Vincent Strader was the leaseholder. When the officers arrived at the apartment, a man named Thornton answered the door. Police showed a wanted poster of Shields to Thornton, who stated that he did not know him.

Thornton stated that he and another man were staying at the apartment temporarily. When the detective asked Thornton if he was in charge of the apartment, he responded that he was. The detective then asked Thornton for permission to search the apartment for Shields, and Thornton consented. Upon entering the living room an officer saw two baggies containing a light brown substance, and another officer found a digital scale in the kitchen sink with white residue on it. After obtaining a

search warrant for the apartment, officers found cocaine, heroin, a handgun and items associated with packaging drugs. Strader was convicted of several offenses and this Court affirmed his judgment of sentence. On appeal, the Supreme Court affirmed "the finding below that police reasonably believed Thornton had authority to consent to search." *Strader*, *supra* at 429.

The conduct of POs Anglemeyer and Zitsch in the instant matter falls far short of the officers' actions in *Strader*, and as such does not support the apparent authority exception. Whereas the officers in *Strader* questioned Thornton to determine if he was in charge of the apartment, here, both POs testified that they did not know who the 20-year-old woman was, and still did not know at the time of the suppression hearing. N.T. Suppression Hearing, 11/25/14, at 5-6. PO Anglemeyer testified that he believed her to be Black's sister, but there is no evidence in the record substantiating that belief. *Id.* As opposed to Thornton, the woman was not the one who answered the door, diminishing the chance that she was in charge of the household. *Id.* Her only statement to the POs was to confirm that Black was inside the house, far short of actual consent to enter. Finally, as stated above, Black's mother, an individual familiar to PO Anglemeyer from prior visits, was on the couch in the next room. *Id.* Therefore, unlike Thornton, who had been put in charge of Strader's apartment in his absence, the true homeowner was present, and her failure to consent trumps any apparent authority POs Anglemeyer and Zitsch may have believed the

unidentified woman had. It was unreasonable for POs Anglemeyer and Zitsch to presume that the woman had authority based on her one statement regarding Black's location without any further inquiry, and as such the apparent authority exception does not apply. **Blair**, **supra**.

As previously noted, county probation officers may conduct personal and property searches if there is reasonable suspicion that the offender either possesses or controls contraband or other evidence of violations. **See** 42 Pa.C.S. §§ 9912(d)(1)(i), (2).

In **Commonwealth v. Wilson**, 67 A.3d 736 (Pa. 2013), our Supreme Court held:

> Section 9912(d)(2) is a specific provision addressing a narrow circumstance: the conditions under which a county probation officer may conduct a warrantless search, including a requirement that the probation officer must possess reasonable suspicion that the property contains contraband or other evidence of violations of the probationer's terms of probation. The provision is clear and unambiguous and lists no exception. The reason for the restrictions . . . are obvious: searches implicate constitutional rights (even though the Fourth Amendment rights of probationers are diminished).

**Id.** at 744.

Here, the probation officers undertook a warrantless, suspicionless search of Black's person and property. After being let in by a 3- to 4-year old child, they ran past Black's mother who asked, "what are you doing going up my steps?" N.T. Suppression Hearing, 11/25/14, at 37. They went upstairs, opened the partially closed bedroom door, and searched his person and property.

This Court has held that routine home visits by parole agents are not searches within the meaning of the Fourth Amendment. *Commonwealth v. Smith*, 85 A.3d 530, 537 (Pa. 2014). Here, PO Anglemeyer testified that he and his partner "were out doing routine filed contacts where we would go to [d]efendants' houses and have regular probation contact with them. Approximately 1315 hours, we stopped at the [Black's] house to attempt a home contact." N.T. Suppression Hearing, 11/25/14, at 5-6. However, we agree with Black that what took place was not a routine home check.

Black's mother testified that in the past, when PO Anglemeyer came to the house, he would ask for Black. She would then call for her son, who would come downstairs to meet with PO Anglemeyer. Officers had never gone straight up to his room before. *Id.* at 37.

A comparison of the facts of *Smith* with the instant matter is instructive. In *Smith*, agents went to a parolee's house on December 21, 2011, for a routine visit as part of the City of Chester's Threat Initiative under which "high risk offenders . . . who have numerous convictions for drugs sales and/or gun possession, have their residences checked." *Smith*, 85 A.3d at 532. Shortly before the visit, one of the agents received an anonymous tip that Smith was selling large amounts of marijuana.

Agents arrived at Smith's home and he allowed them to enter. As the agents walked through the house, they passed the basement door and noticed the odor of unburnt marijuana. They opened the door and the odor

became stronger. One of the agents went down the stairs and found a large quantity of marijuana along with money, a scale and unused baggies.

Smith was later arrested and prior to trial sought to suppress evidence obtained during the search of his residence. The trial court denied suppression and found him guilty of possession with intent to deliver. On appeal, this Court affirmed, noting that the parole agents' actions in walking through the house did not constitute a search.

> During this lawful visit, Agent Peterson smelled marijuana emanating from Appellant's basement, and at that juncture, they developed the requisite reasonable suspicion to conduct a search for the marijuana. Notably, the 'plain view' doctrine renders a search and seizure permissible where: (1) the government officials have not violated the Fourth Amendment in arriving at the location from which the item could be viewed; (2) the item is in plain view; (3) the incriminating character of the item is immediately apparent; and (4) the government officials have a lawful right of access to the item itself. [] Given that the parole agents were visiting Appellant at his residence in accordance with their supervisory duties, the smell of marijuana gave rise to reasonable suspicion for the agents to conduct a search for the contraband that was ultimately located in the basement.

*Smith*, *supra* at 537 (internal quotations and citations omitted).

In *Smith*, the parole agents conducted their home visit based on the high-crime initiative and a recent tip that the parolee was selling large quantities of marijuana. In contrast, the only reason advanced by the Commonwealth in this case is that during a visit almost four months before, Black had admitted to PO Anglemeyer that he had sold marijuana. A second significant difference is that while Smith voluntarily allowed the agents into a private residence, probation officers did not have consent to enter Black's

home. Once inside, the agents in **Smith** conducted a plain view check of the house. However, in this case, officers went up the stairs, opened the bedroom door that was partially shut, and proceeded to search Black's clothing and his room.

Unlike **Smith**, where the agents developed reasonable suspicion to search based on the odor of the marijuana,[5] the Commonwealth presented no evidence of reasonable suspicion to search Black's mother's home, Black's bedroom or his person. Accordingly, the evidence seized and any incriminating statements made by Black should have been suppressed. **See Wilson**, **supra**.

The officers' failure to obtain consent to enter the home is compounded by the failure to establish that the officers obtained consent to enter Black's bedroom. PO Anglemeyer testified:

> [Black's] door was slightly ajar a couple of inches. I was able to see in there. I knocked on his door. I was able to see him, you know. He was on his stomach, facing away, laying on his bed doing something with his hands, movements with his hands.
>
> So I had announced – he asked who it was. I announced probation. I walked in when I saw him making movements with his hands. He turned over, sat up, took his blankets off himself.

N.T. Suppression Hearing, 11/25/14, at 7.

On cross-examination, PO Anglemeyer could not say for certain that Black gave him permission to enter his room. **Id.** at 18. The

---

[5] "Plain smell" is analogous to the concept of "plain view." **See Commonwealth v. Copeland**, 955 A.2d 396, 401 (Pa. Super. 2008).

Commonwealth's evidence that Black *might* have given the officers consent to enter his room is insufficient to meet its burden to establish consent in the absence or reasonable suspicion or exigent circumstances.

Although PO Anglemeyer could not say whether Black consented to the officers' entry into his room, he did testify that Black consented to the search of his room and its contents. Black denied the officers asked him for consent to search. *Id.* at 47. The conflicting testimony with respect to the search of the room is of no moment because the illegal entry of the officers into the house and bedroom requires the suppression of all evidence.

With respect to this issue, our Supreme Court has noted:

Where . . . a consensual search has been preceded by an unlawful seizure, the exclusionary rule requires suppression of the evidence obtained absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness.

*Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000) (citation omitted).

Additionally, we note that the Commonwealth did not assert the existence of exigent circumstances that would permit the warrantless entry into Black's mother's home. As this Court has recognized, even where officers have probable cause at the time of a warrantless entry, the Commonwealth must "demonstrate exigent circumstances sufficient . . . to overcome the strong presumption that the warrantless invasion of

Appellant's home was illegal." ***Commonwealth v. Waddell***, 61 A.3d 198, 216.

For the reasons set forth herein, the trial court erred by admitting into evidence the items obtained from the search of Black's person and belongings.

Judgment of Sentence reversed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/16/2016