**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Kelly L. CORDELL, Defendant-Appellant.**

**No. 83–1103.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1983.

Decided Dec. 12, 1983.

Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1291.

Walter F. Kelly, Sutton & Kelly, Milwaukee, Wis., for defendant-appellant.

Ira H. Raphaelson, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before ESCHBACH and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

ESCHBACH, Circuit Judge.

We are asked in this appeal to determine whether, during an encounter between police officers and the appellant, Kelly Cordell, Cordell was illegally detained in violation of his right under the Fourth Amendment to be free from unreasonable seizures. We are also asked to determine whether the

government presented sufficient evidence at trial to show that Cordell knowingly possessed the cocaine with which he was found. Because we have determined that Cordell's rights under the Fourth Amendment were not violated, and that the evidence against him was sufficient, we affirm Cordell's conviction.

## I.

Cordell was charged in a one count indictment with possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1). He moved to suppress the cocaine, contending that it had been illegally seized. The district court held a suppression hearing and made findings of fact, which we summarize below.

On July 6, 1982, Chicago police officers Terrence O'Connor and Ricardo Abreu were assigned to narcotics duty at O'Hare International Airport. The officers were monitoring a non-stop flight to Chicago originating in Miami, a known "source" city for narcotics. The officers observed Cordell disembark from the Miami flight, carrying a travel bag. Cordell proceeded at a very rapid pace through the airport terminal. The officers followed Cordell at a distance as he proceeded down two escalators and into an open area that connects the terminals to the parking garage and the Hilton Hotel. The area is a well lighted public place. The officers approached Cordell from behind, and O'Connor said, "Pardon me, sir." The officers identified themselves as police, and asked if Cordell would speak to them. Cordell agreed, and placed his travel bag on the floor beside him. O'Connor requested some identification, and Cordell produced his Wisconsin driver's license. O'Connor then asked to see Cordell's airline ticket. Cordell produced a ticket, purchased for cash, in the name of P. Baldwin. Cordell appeared extremely nervous during the conversation, but was polite and cooperative. O'Connor handed the ticket and license to Abreu, told Cordell they were conducting a narcotics investigation, and asked Cordell if he was carrying narcotics. When Cordell replied that he was not,

O'Connor asked if Cordell would object to the officers looking in his travel bag. Cordell replied, "No, sir, go ahead." O'Connor opened the bag and saw miscellaneous items of clothing and a large padded packing-type envelope. The envelope was sealed, addressed to a Milwaukee address with a Florida return address, and bore uncancelled stamps. O'Connor asked Cordell what was inside the envelope. Cordell replied that he did not know, as a man in the Miami airport had given it to him and asked him to deliver it to Milwaukee. O'Connor asked if Cordell would object if he opened the envelope. Cordell stated that he did not mind because the envelope was not his. O'Connor opened the envelope and observed a plastic bag containing a white powder. O'Connor then informed Cordell that he was under arrest, advised him of his rights, and escorted him to the Drug Enforcement Administration Office in the airport. The white powder discovered in Cordell's bag was subsequently disclosed to be approximately 240 grams of fifty-percent cocaine.

The trial court denied Cordell's motion to suppress the cocaine, ruling that, although the search was not conducted pursuant to a warrant, none was necessary as Cordell had consented to the search. Cordell was convicted of the charge after a bench trial, sentenced to a term of one year and one day, and further ordered to serve a special parole term of five years.

## II.

### A. The Airport Encounter

The district court found that Cordell's consent to the search of his travel bag and the envelope containing the cocaine was voluntarily given. While the appellant testified that he withheld his consent to the search of the envelope, the trial judge did not credit his testimony. We do not understand Cordell's argument on appeal to be that his consent was involuntary because it was given under coercion or duress. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Rather, Cordell claims that he was

being illegally detained at the time the search was conducted, rendering the cocaine discovered in that search inadmissible against him as "the fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The question, then, is whether at some point during the encounter, Cordell was being detained and, if so, whether the detention was constitutional.

■ Not all encounters between police officers and citizens implicate the provisions of the Fourth Amendment. In *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), Justice White was joined by seven other justices in holding that:

> Law enforcement officers do not violate the provisions of the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.... Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.

*Id.* 103 S.Ct. at 1324 (citations omitted). When officers O'Connor and Abreu identified themselves as police officers, asked Cordell if he would speak to them, and requested his identification and airline ticket, they were doing nothing that could be construed as a Fourth Amendment seizure unless one views all encounters between the police and citizens as seizures requiring justification, and we do not.

■ However, when O'Connor handed Cordell's driver's license and airline ticket to Abreu, and told Cordell they were conducting a narcotics investigation, the encounter had become a detention. The detention, though, never exceeded the boundaries of an investigatory stop. *Id.* at 1326. Thus the question we must answer is whether the officers had a reasonable, articulable suspicion of criminal activity—the

standard of justification for investigatory stops. *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

■ At the time they detained Cordell, the officers in this case did have a reasonable suspicion. *Royer,* 103 S.Ct. at 1326 (on facts similar to those here, eight justices agreed officers had reasonable suspicion justifying investigatory stop). In this case, Cordell had arrived from a major "source" city for narcotics. The names on his airline ticket and his driver's license did not match. He had paid cash for his ticket. He appeared to be extremely nervous, and became more nervous as the officers continued to question him. Officers O'Connor and Abreu had been involved in narcotics investigations for seven and five years, respectively, and had been assigned to the O'Hare Task Force for well over a year. The officers clearly were "entitled to assess the facts in light of [their] experience," *Brignoni-Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582, and to suspect Cordell of a violation of the narcotics laws.

Finally, unlike the situation in *Florida v. Royer,* the detention in this case never matured into an arrest for which probable cause was needed. Royer was told he was under investigation for criminal activity, and taken to a small room while his baggage was retrieved, without his consent, from the airline. As Justice White noted for the plurality, "had Royer consented to a search on the spot [e.g., in the terminal where he was stopped], the search could have been conducted ... and any evidence recovered would have been admissible against him." 103 S.Ct. at 1328. In the instant case, Cordell did consent to a search "on the spot," and the evidence discovered in the search was properly admitted against him.

## B. The Sufficiency of the Evidence

■ Cordell also claims that the evidence against him was insufficient to establish his knowing possession of the cocaine found in his travel bag. We find no merit to this

claim. There is no question that Cordell arrived from Miami with approximately 240 grams of fifty-percent cocaine in his bag. Cordell maintained that a stranger in the Miami airport asked him to deliver the envelope containing the cocaine to Milwaukee, the city to which it was addressed. The return address on the envelope was fictitious. The Milwaukee address exists, but does not belong to "Joe Scott," to whom the envelope was addressed. Beyond the question of how a stranger in the Miami airport would have known that Cordell, who was boarding a flight for Chicago, was ultimately to arrive in Milwaukee, we find it inherently incredible, as did the district court, that a stranger would entrust appellant with drugs worth close to $60,000. Appellant did not claim that he was not in knowing possession of the envelope itself; rather, he claimed to be ignorant of its contents. Under these circumstances, there is more than enough evidence to establish Cordell's knowledge.

### III.

For the reasons expressed in the opinion, the judgment of conviction is affirmed.

SWYGERT, Senior Circuit Judge, concurring.

I concur in the judgment of this court that the conviction of the defendant should be affirmed. I write separately, however, to express my views on the issues and why I feel constrained by the principle of *stare decisis* to vote for affirmance.

It cannot be disputed that the two police officers who accosted the defendant at O'Hare Airport initially had no reasonable and articulable suspicion that he was involved in illegal activity. The facts that aroused their attention—that he came from Miami and walked through the airport rapidly after leaving the plane—are insufficient to justify even an investigatory detention (a *"Terry* stop," *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) short of an arrest. *See Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam). But it is

established that not every "stop" is a detention requiring the modest fourth amendment protection of "reasonable suspicion" prescribed by *Terry.* In particular, the Supreme Court has held that police officers may "approach[ ] an individual on the street or in another public place, ... ask[ ] him if he is willing to answer some questions, [and] put[ ] questions to him if the person is willing to listen" without implicating the fourth amendment at all. *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion); *see also Reid v. Georgia,* 448 U.S. at 440 n. *, 100 S.Ct. at 2753 n. *; *Terry v. Ohio,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. It is generally agreed that an encounter is not covered by the fourth amendment unless "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *see also United States v. Black,* 675 F.2d 129, 134 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

I believe that as a factual psychological matter people who are stopped for questioning of this kind by police officers, particularly officers who identify themselves as narcotics investigators, generally do not feel "free to leave" because of the implicit show of authority and singling out of the individual as suspicious. If I were writing on a clean slate, therefore, I would hold that such stops, as contrasted with non-confrontational encounters such as asking for directions or questioning possible witnesses of a crime, satisfy the *Mendenhall* criterion and must be justified by reasonable, articulable suspicion. The juxtaposition of the *Royer* and *Mendenhall* lines of cases demonstrates, however, that whether a reasonable person would feel free to leave is a technical legal construct rather than a simple factual inquiry, and that the category of cases in which one would feel "free to leave" in this sense includes simple requests for questioning. I therefore am compelled to conclude that the police officers were free to approach the defendant in this case

and elicit answers from him without any basis for suspicion whatever. My conclusion would be different, of course, if the officers had blocked his path, approached him in a nonpublic place, displayed weapons, overcome hesitancy by the invocation of authority, or otherwise displayed their power to compel compliance.

The legality of the initial encounter does not end the inquiry, for if the officers prolong the encounter it may become a detention within the fourth amendment's ambit. As Judge Eschbach indicates in his opinion, the initial questioning in this case ripened into a detention implicating the fourth amendment because the officers retained Cordell's driver's license and ticket, impeding his departure. This detention was proper only if the officers could articulate sufficient suspicion based on what they knew at that time. The additional information they had elicited was that Cordell had purchased his ticket in cash, used an alias, and was physically trembling during the questioning. The officers' intuition based on experience does not constitute an independent datum; experience may enable officers to spot suspicious circumstances to which the untrained would be oblivious, but is no more a part of the suspicion than binoculars are part of the landscape. *See Reid v. Georgia,* 448 U.S. at 441, 100 S.Ct. at 2754. We cannot defer to bare intuition because "[t]he scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances," *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1879 (footnote omitted), and review is possible only if the basis for official action is articulable. Although I believe the facts then known by the officers were a slender reed on which to base a detention, like the majority I defer to the statement in *Royer,* analyzing similar facts, that "travelling under an assumed name, . . . paying cash for a one-way ticket, the mode of checking the two bags [under an alias and with a vague

destination], and [the defendant's] appearance and conduct in general . . . were adequate grounds for suspecting [him] of carrying drugs and for temporarily detaining him and his luggage while [the officers] attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention." 103 S.Ct. at 1326.

Finally, in the course of the detention the officers sought and received permission to search Cordell's bag and the package it contained. It is established "that where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Id.* at 1324 (citations omitted). Again, if I could write afresh, I would conclude that in reality consent to a search that is so obviously contrary to one's interest is no more voluntary than "mere submission to a claim of lawful authority" because of the likelihood that the consent was uninformed and because of the pressures of the situation. The reality here is that the officers had the defendant's driver's license and airline ticket in their hands. They told him that they were conducting a narcotics investigation and asked him if he was carrying narcotics. He was not told that he need not consent to the search. It is clear to me that psychologically he could only believe that he had no choice but to consent. Nevertheless, I defer to the holding of *Mendenhall,* 446 U.S. at 557–58, 100 S.Ct. at 1878–79, that such considerations are not dispositive, and therefore would affirm the district court's finding that the consent was voluntary.

I feel compelled to note in closing that the kind of random stopping of air travelers illustrated by this case is not unusual. At oral argument, government counsel was questioned about the number and proportions of people who walk away, who consent to questioning, and who are found to be carrying drugs when stopped and asked to answer questions. Government counsel answered that six to twelve stops per day are

made at O'Hare, and later supplemented his statistics by letter to the panel, indicating that agents had testified in another case that in their experience at O'Hare approximately ten percent of the people stopped refused to talk, thirty percent of the encounters ended after brief questioning without requests to search, thirty percent involved searches resulting in seizures of narcotics, and thirty percent involved searches that yielded nothing or contraband other than drugs. I conclude from these limited and unsystematic statistics that many innocent people are being stopped and questioned. Few people who are stopped for questioning know that they need not give answers and may walk away without consequences. Few people will assert their rights, even if known, in the face of police authority.

This practice is troubling for two reasons. Countenancing large numbers of minor, though unwarranted, intrusions erodes the principle of freedom from official interference guaranteed by the fourth amendment, and invites the use of arbitrary or discriminatory principles of selection abhorrent to the fourth amendment. *See Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (fourth amendment embodies dual concerns of protecting privacy and avoiding arbitrariness and abuse); *Delaware v. Prouse,* 440 U.S. 648, 654, 661, 662–63, 99 S.Ct. 1391, 1396, 1400–01 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 882–83, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. at 14 & n. 11, 15, 21–22, 88 S.Ct. at 1876 & n. 11, 1879–1880. That the amendment may, at times, protect the criminal is the price that must be paid if we are to keep these protections alive for all people. Today's holding may presage further atrophying of an important segment of the bill of rights.