629 A.2d 161

COMMONWEALTH of Pennsylvania

v.

Cheri A. TINDELL, Appellant.

Superior Court of Pennsylvania.

Argued May 12, 1993.

Filed Aug. 9, 1993.

Charles M. Schwartz, Pittsburgh, for appellant.

Kevin F. McCarthy, Asst. Dist. Atty., Pittsburgh, for Com. appellee.

Before McEWEN, OLSZEWSKI and FORD ELLIOTT, JJ.

OLSZEWSKI, Judge:

Cheri Tindell ["Tindell"] appeals from the judgment of sentence entered July 15, 1992, in the Court of Common Pleas of Allegheny County. On May 19, 1990, Tindell was charged with one count of possession of a controlled substance and one count of possession with intent to deliver. The charges stemmed from the discovery of cocaine on Tindell's person while travelling through Greater Pittsburgh International Airport. Tindell's counsel filed an omnibus pre-trial motion on October 7, 1991, arguing that police lacked reasonable suspicion to conduct an investigatory stop or probable cause to make a warrantless arrest, and that the drugs seized should be suppressed. The court denied the motion. On January 16, 1992, after a hearing, Tindell waived her right to a jury trial. The case was submitted to the court on stipulations and the evidence presented at the suppression hearing of October 7, 1991. The court found Tindell guilty of possession and possession with intent to deliver.

Tindell filed post-verdict motions and a motion for a new trial on January 27, 1992. The motions were denied on March 31, 1992. On July 15, 1992, the court sentenced Tindell to four-to-eight years imprisonment and a $25,000.00 fine. This appeal followed. In order to fully understand the nature of Tindell's arguments, it is necessary to review the factual history of this case.

On May 18, 1990, at approximately 10:30 p.m., two county police officers assigned to the Drug Interdiction Unit at Greater Pittsburgh International Airport saw Tindell deplaning from a flight originating from LaGuardia Airport in New York City. In their attempt to ferret out drug couriers, the officers were trained to look for certain characteristics which differentiated the average airline passenger from individuals carrying drugs. The officers testified that they noticed Tindell particularly because she was wearing an oversized shirt and numerous items of gold jewelry. After she exited the plane, Tindell walked slowly through the airport, as if she were looking for someone. She did not have any baggage to claim, but carried a nylon bag, a plastic bag, and a purse. She

approached a public telephone, but instead of making a phone call shouted "Joe" to a man walking nearby. The two met and began walking together toward the exit doors, where they paused to talk. The officers approached Tindell and "Joe," and asked her if she would mind speaking with them. "Joe" walked off. The officers informed Tindell that she was not obligated to speak to them. Nonetheless, she agreed to speak with them.

The officers explained that they were narcotics officers and reiterated that she was not obligated to speak with them. Thereafter, the officers learned that Tindell was travelling on a one-way ticket from New York City which was paid for in cash under the name Singletary. Tindell stated her name and explained that her aunt purchased the ticket for her and that her aunt's name was Singletary. Tindell produced photo identification which bore her name. One of the officers testified that at that point he recognized Tindell's name from an $800.00 money order receipt which was found on Orin Claypool, a drug suspect, in July 1989. The money order had been sent to New York. The suspect was from New Kensington, Westmoreland County, PA. The officer had spoken with a Westmoreland County narcotics officer who told him that Cheri Tindell was the sister of known drug dealer Jack Tindell, and that she often transported drugs for her brother from New York. S.T., 10/7/91 at 21–22.

One of the officers asked Tindell whether she would consent to a search of the bags she was carrying. She consented. The search produced no contraband. The officer then contacted the police station and requested a female officer to search Tindell's person. As they were waiting for the female officer, the police asked Tindell if she knew Jack Tindell. She identified him as her brother. She denied knowing Orin Claypool. Officer Llewellyn, a female officer, arrived. The officers advised Tindell that she was free to refuse the pat down search of her person. She did not refuse. Officer Llewellyn and Tindell moved into a more secluded area for the search. Before the officer searched Tindell, Tindell unzipped her jeans and produced a package wrapped with electrical tape. Officer

Llewellyn gave the package to one of the narcotics officers, who asked Tindell what it was. Tindell replied that it was cocaine and was placed under arrest.

■ On this appeal, Tindell argues that the officers lacked reasonable suspicion to stop her or probable cause to make a warrantless arrest, and that suppression of the evidence was required. In reviewing the denial of a motion to suppress evidence, we must first determine:

whether the factual findings are supported by the record. In making this determination, we must consider only the evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings, we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Medley,* 531 Pa. 279, 284, 612 A.2d 430, 432 (1992); *McElrath v. Commonwealth,* 405 Pa.Super. 431, 435–437, 592 A.2d 740, 742 (1991).

■ On an appeal from a motion to suppress, we only review whether the record supports the trial court's factual findings and whether the trial court's legal conclusions drawn from the facts are in error. *Commonwealth v. Merkt,* 411 Pa.Super. 127, 600 A.2d 1297 (1992). In this case, we find no such error.

The trial court found that the police officers involved in Tindell's arrest were specially trained for airport drug interdiction and had two and one-half years experience at their posts. In addition, the trial court noted that these drug interdiction officers were trained to look for certain mannerisms, such as dress, amount of and/or lack of baggage, and places of origination, particularly drug "source cities" such as Miami, New York City, Los Angeles, Detroit and Houston. These assertions are supported by the record.

The officers involved in Tindell's arrest testified that they were trained to look for possible drug suspects deplaning from flights from drug "source cities." N.T., 10/7/91 at 6. Officer Olearchick testified that the loose clothing worn by Tindell as she deplaned was characteristic of people attempting to con-

ceal drugs on their person. *Id.* at 8. In addition, Officer Olearchick testified that Tindell's casual clothing and contrasting abundant gold jewelry, as well as her lack of baggage were consistent with the behavior of people carrying drugs. *Id.* After police stopped Tindell to question her, at which time she was advised that she was not required to speak with them, the officers learned that Tindell was travelling under an assumed name. These factors support the reasonableness of the officers' suspicion to justify an investigative stop. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (in evaluating the reasonableness of a stop, courts must look to the totality of the circumstances). In addition, the United States Supreme Court has held that where an airline passenger utilizes an assumed name, is casually dressed, pays cash for a one-way ticket, and does not check baggage, police officers trained in drug interdiction have sufficient grounds upon which to reasonably suspect that a person may be carrying drugs. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

▮▮▮▮ Contrary to Tindell's argument, she was not "seized" for purposes of the Fourth Amendment.

A police encounter with a suspect may properly be characterized as a mere encounter, an investigative detention, a custodial detention, or a formal arrest. A mere encounter (or request for information) need not be supported by any level of suspicion, but it carries no official compulsion to stop or to respond ... An investigative detention must be supported by reasonable suspicion; it subjects the suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest ... A custodial detention must be supported by probable cause; it is deemed to arise when the conditions and/or duration of an investigating detention become so coercive as to be the functional equivalent of arrest ... Formal arrest requires probable cause, and needs no further definition.

*Commonwealth v. Douglass,* 372 Pa.Super. 227, 238–239, 539 A.2d 412, 417–418 (1988) (citations omitted). There is no

constitutional prohibition against a police officer questioning an individual in a public place. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Interest of Jermaine,* 399 Pa.Super. 503, 582 A.2d 1058 (1990). A seizure of a person sufficient to trigger Fourth Amendment protections occurs only where, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave. *Id.*

■ Tindell's conversation regarding her name and plane ticket can be characterized as a mere encounter. Throughout the encounter, Tindell was advised of her right to refuse to talk to the officers. N.T., 10/7/91 at 29, 71, 72, 74, 75. After further discussion and production of identification, the officers recognized Tindell's name in connection with another drug arrest. This connection had been investigated and corroborated by police detectives at the time of Orin Claypool's arrest. At this point, reasonable suspicion that criminal activity was afoot was justifiable, and supported an investigative detention. Nevertheless, Tindell was not seized. She was apprised of her right to refuse a pat down search, but she consented. *Id.* Tindell voluntarily produced the cocaine she was carrying. There was no evidence that the officers retained her identification documents, blocked her path to exit, threatened her, demanded that she do anything, or touched her. Only when police, through a showing of authority or assertion of physical force, have somehow restrained the liberty of an individual may we conclude that a seizure has occurred. *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). Accordingly, the encounter that occurred in this case was not a seizure and Fourth Amendment guarantees were not implicated. *See U.S. v. Mendenhall, supra; INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Interest of Jermaine, supra; Commonwealth v. Lidge,* 399 Pa.Super. 360, 582 A.2d 383 (1990).

The order of the trial court denying Tindell's motion to suppress is affirmed. Judgment of sentence affirmed.

FORD ELLIOTT, J., filed a concurring opinion.

FORD ELLIOTT, Judge, concurring:

While I agree with the result reached by the majority, that the evidence against appellant should not be suppressed, I most respectfully disagree with the route utilized by my colleagues to arrive at that result.

Because I am bound by prior decisions of this court and the United States Supreme Court, I am required to accept that the so-called "drug courier profile" vests law enforcement officers with the requisite reasonable suspicion that criminal activity is afoot to justify stopping persons in public airports and posing questions to them. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Commonwealth v. Lidge*, 399 Pa.Super. 360, 582 A.2d 383 (1990), *appeal denied*, 527 Pa. 598, 589 A.2d 689 (1991); *In the Interest of Jermaine*, 399 Pa.Super. 503, 582 A.2d 1058 (1990), *appeal denied*, 530 Pa. 643, 607 A.2d 253 (1992).[1]

1. However, I must in candor agree with this court's statement in *Commonwealth v. Daniels*, 410 Pa.Super. 275, 279 n. 1, 599 A.2d 988, 990 n. 1 (1992), *appeal denied*, 531 Pa. 645, 612 A.2d 983 (1992), *cert. denied sub nom., Pa. v. Daniels*, —— U.S. ——, 113 S.Ct. 1361, 122 L.Ed.2d 740 (1993), at footnote one which calls into question the validity of the profile:

The drug courier profile is not a 'national profile.' Profiles vary from city to city, airport to airport and also depending on which law enforcement agency is using them. The profile is subject to racial abuse and gender stereotyping, where the fact that a person is an African–American, Columbian, or Hispanic has appeared as a profile characteristic, as has the fact that the person was the only woman on an airplane carrying business travelers. *Commonwealth v. Lidge*, 399 Pa.Super. 360, 582 A.2d 383 (1990). A breakdown of profile traits listed in the reported decisions reveals that it encompasses such contradictory characteristics as deplaning first and deplaning last, paying with small bills and paying with large bills. It also encompasses an extraordinary amount of innocent behavior such that the average airline traveler would be hard-pressed to not display at sometime during a trip. Furthermore, it is not clear whether the display of one or two characteristics is sufficient to fit the profile or whether if some characteristics carry greater weight than other characteristics such that the display of one of these weightier characteristics may trigger an airport stop. *Note, the Drug Courier Profile*

I agree with the majority that, assuming the validity of the drug courier profile, the police were acting lawfully when they *stopped* appellant and asked her questions. Characterizing the initial "stop" as a mere encounter does not change the fact that by utilizing the drug courier profile the police also had the reasonable suspicion required for an investigatory detention. *See Sokolow, supra; Royer, supra* and *Mendenhall, supra.*[2] However, where I must part from the majority, is in

and Airport Stops; Reasonable In[t]rusions or Suspicionless Seizures. 12 Nova.L.Rev. 273, 288–289.
*Id.*

2. I am constrained to recognize the initial questioning by the police as a mere encounter, based on the recent rulings of this court and the United States Supreme Court. However, I find more persuasive the analysis presented by Judge Popovich in dissent in *Jermaine*. The dissent reasoned:

I am convinced that under the foregoing facts, a reasonable person would believe she was not free to leave. To hold otherwise would be to perpetuate the myth that a reasonable person, when confronted by police officers, actually believes she has the option of declining to listen to the officers and leaving without suffering further consequences. Although constrained to follow the judgment of the Supreme Court regarding what a reasonable person believes when confronted by a law enforcement officer, numerous Circuits of the United States Court of Appeal have recognized the artificiality of the Supreme Court's test. *See United States v. Thame*, 846 F.2d 200, 202 (3rd Cir.1988), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988) ('Although we have our doubts whether a reasonable person who is greeted by federal agents and asked for identification feels free to simply ignore the agents....'); *United States v. Notorianni*, 729 F.2d 520, 522 (7th Cir.1984) ('Maybe this is a wrong guess about what the average person feels in this situation....'); *United States v. Cordell*, 723 F.2d 1283, 1286 (7th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984) (Swygert, J., concurring) ('I believe that as a factual psychological matter people who are stopped for questioning of this kind by police officers ... generally do not feel "free to leave"....'); see also Note, The Drug Courier Profile and Airport Stops: Reasonable Intrusions of Suspicionless Seizures?, 12 Nova L.Rev. 273, 284 (1987) (lower courts recognize 'the artificiality of the test')....
*Jermaine*, 399 Pa.Super. at 517–518, 582 A.2d at 1065.

Further, I believe it strains the imagination to say that a police request to search one's bags, purse or person can be a part of an inoffensive and unintrusive "mere" encounter. To carry forward such logic would be to convert a weapons pat down, otherwise defined by Fourth Amendment case law as a Terry stop, into a mere encounter so long as the police are polite about it and gentle in where they place their hands. Rather, I believe the focus must center on the nature of

its determination that at the point where the "mere encounter" blossomed into an "investigatory detention," still no "seizure" had occurred within the meaning of the Fourth Amendment.

I completely agree that when the police recognized appellant's name from a prior drug investigation wherein she had been implicated as a possible drug courier, they not only had the requisite reasonable suspicion for continued investigatory detention, but they also had probable cause to obtain a search warrant for her person. *Cf. Commonwealth v. Martin,* —— Pa. ——, 626 A.2d 556 (1993) (search of satchel involved search of "person" and probable cause was necessary for canine sniff of satchel). The police testified to as much at the suppression hearing:

BY MR. FITZSIMMONS:

Q. Let me ask you this, sir. Did you ever communicate to Ms. Tindell anything about a search warrant or anything about that, sir?

A. I believe after Officer Llewellyn got there we did mention it. It was in the report.

Q. What exactly did you tell her with respect to that, sir?

A. I had stated that we, myself and Detective Zilch, believed that we had enough information, had enough probable cause to attempt to get a search warrant, and as I said, you know, she could refuse the pat down, she was free to refuse the pat down, but if she refused the pat down that we believed we had enough and we would attempt to get the search warrant for her person.

Q. That's something that you communicated to her?

the request being made by the police and not on the alleged consent. The validity of any consent to search must be determined within the context of the right of the police to make the request in the first instance. *Compare Commonwealth v. Danforth,* 395 Pa.Super. 1, 576 A.2d 1013 (1990), *aff'd sub nom., Commonwealth v. Kohl,* 532 Pa. 152, 615 A.2d 308 (1992) (otherwise valid actual consent to a blood test rendered invalid because police lacked probable cause to make the request).

A. That's something I communicated, yes, sir.

(Notes of testimony, 10/7/91 at 30.)

Clearly, appellant was not free to leave, and this was communicated to appellant. If she was not free to leave, then she was "seized" for constitutional purposes. In the context of the events of this case, the police officers informing appellant that she was not required to submit to a pat down search, did not mean that she wouldn't be searched; but rather, that if she did not consent they would get a warrant. Obviously, under the circumstances, appellant was not free to leave. Therefore, our analysis of the legality of the police officers' activities must be within the stricture of the Fourth Amendment.

However, while I disagree with the majority on the seizure issue, I agree with them that appellant voluntarily relinquished the drugs on her person. Under the Fourth Amendment, the consensual relinquishment of the drugs by appellant must be viewed within the context of the detention. Here it is unquestionable that under the totality of the circumstances the detention of appellant was legal; and therefore, I would find no violation of appellant's Fourth Amendment rights when she retrieved the drugs from her own person where the alternative was for the police to secure a warrant.