In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-3490

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SYED F. AHMAD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 18-cr-30059 — **Richard Mills**, *Judge.*

ARGUED SEPTEMBER 18, 2020 — DECIDED DECEMBER 22, 2021

Before SYKES, *Chief Judge*, and HAMILTON and ST. EVE, *Circuit Judges*.

SYKES, *Chief Judge*. A deputy sheriff on drug-interdiction duty in central Illinois observed an RV with a dirty license plate traveling on Interstate 72. He followed the RV as it exited the freeway and pulled into a truck-stop parking lot. The driver, Syed Ahmad, entered the convenience store with one of his passengers. When a store employee informed the deputy that the two men were acting strangely, the officer

asked to speak with them before they reentered the RV. They agreed. After a few preliminary questions, the deputy asked for Ahmad's driver's license and the rental agreement for the vehicle. Ahmad produced the documents. The deputy then asked for consent to search the RV. Ahmad agreed, but the deputy did not immediately conduct a search. Instead, he called for a K-9 unit.

The unit arrived a few minutes later, and Ahmad agreed to a dog sniff of the RV. The dog quickly alerted. At that point—about 15 minutes into the encounter—Ahmad was detained while the deputy searched the RV, where a large quantity of marijuana was discovered.

Ahmad was indicted for possession of more than 100 kilograms of marijuana. He moved to suppress the drugs, arguing that his consent to search was involuntary because he had already been seized for Fourth Amendment purposes at the moment the deputy retained his driver's license and the RV rental agreement. The district judge disagreed and denied the motion. Ahmad pleaded guilty but reserved the right to appeal the denial of suppression.

We affirm. The deputy's brief possession of Ahmad's license and rental agreement did not transform this otherwise consensual encounter into a seizure. Ahmad voluntarily consented to both the external dog sniff and the search of the RV.

## I. Background

On December 31, 2017, Deputy Derek Suttles of the Morgan County Sheriff's Office was conducting drug interdiction on the interstate near South Jacksonville, Illinois. He saw an RV with a dirty Idaho license plate traveling on

Interstate 72 and followed it so he could read the plate. Ahmad was driving the RV. His two children and his cousin Muhammad Usama were passengers.

Ahmad exited the interstate and pulled into a Love's Truck Stop. He and Usama left the RV and went into the convenience store. Deputy Suttles parked nearby and entered the store to use the bathroom. He saw Ahmad and Usama but did not approach them. He returned to his squad car, ran the RV's license plate, and learned that it was registered to an elderly couple from Idaho. A store employee then approached Suttles and informed him that Ahmad and Usama were acting strangely and appeared to be waiting for Suttles to leave. Eventually Ahmad and Usama returned to their RV.

Now suspicious, Deputy Suttles waved Ahmad and Usama over, and Ahmad complied. Suttles said that he was "working drug interdiction" and that Ahmad "was free to leave at any time but that [he] wanted to ask him a few questions about his trip." Ahmad agreed to talk, telling Suttles that he was traveling with his two children and Usama from Houston to Columbus, Ohio, to visit family. He said that they first flew to Idaho because it was cheaper to rent the RV there.

Ahmad's geographically perplexing route increased the deputy's suspicions. He asked to see Ahmad's driver's license and the rental agreement, and Ahmad returned to the RV to retrieve the documents. While Ahmad was in the RV, Suttles called Illinois State Trooper Eli Adams to see if he and his drug dog Kilo were nearby.

Ahmad then returned to Suttles and handed him his license and the rental agreement. A few minutes passed while the deputy ran a warrant check, which came back clean. Suttles then asked for consent to search the RV. Ahmad gave permission, but Suttles did not immediately commence a search. He first asked Ahmad to summon Usama from the RV. Ahmad did so. Suttles made the same prefatory comment that he had to Ahmad, telling Usama that he was free to leave but that he'd like to ask a few questions about their trip. Suttles noticed that Usama seemed cold and offered to let him sit in the back of the police squad while they talked. Usama agreed, and Suttles spoke with him for a few minutes in the squad.

About 15 minutes into the encounter, Trooper Adams arrived with Kilo. The officers asked Ahmad if Kilo could sniff around the outside of the RV. He consented. Kilo quickly alerted to the presence of drugs. At that point Ahmad and Usama were detained while the RV was searched. A large quantity of marijuana was discovered, and the officers placed Ahmad and Usama under arrest. Throughout the entire encounter, Suttles spoke in a friendly and conversational tone and never drew his weapon.

Ahmad and Usama were initially charged in state court. They moved to suppress the marijuana, and the state judge held an evidentiary hearing at which Deputy Suttles was the only witness. The judge denied the motion.

Federal charges followed. A grand jury indicted Ahmad and Usama for possession with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). They again moved to suppress the drugs, and the parties waived a second evidentiary hearing

and submitted the motion on the state-court transcript and their written briefs. Drawing on facts developed at the state evidentiary hearing, a magistrate judge recommended that the district judge deny the motion. The district judge agreed, ruling that the defendants' encounter with Suttles was consensual and did not become a seizure under the Fourth Amendment until the dog alerted, so Ahmad's consent to search was voluntary.

Ahmad conditionally pleaded guilty, reserving the right to appeal the denial of suppression. Usama's case is not before us.

## II. Discussion

Ahmad's appeal is limited to the suppression issue. A warrantless search is unreasonable and thus unlawful under the Fourth Amendment unless one of "a few specifically established and well-delineated exceptions" applies. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation marks omitted). At issue here is the consent exception. "[A] search authorized by consent is wholly valid." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "Because a person may voluntarily waive his Fourth Amendment rights, no warrant is required where the defendant consents to a search." *United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009). Accordingly, police officers may "conduct a warrantless search if verbal consent is given." *United States v. Dean*, 550 F.3d 626, 630 (7th Cir. 2008).

But "[c]onsent searches are valid only if the consent was freely and voluntarily given." *United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992). Consent is involuntary if it is tainted by "acquiescence to authority," *United States v.*

*McGraw*, 571 F.3d 624, 628 (7th Cir. 2009), or by police misconduct that overwhelms a defendant's free will, such as "illegal stops, detentions or arrests," *United States v. Jerez*, 108 F.3d 684, 695 (7th Cir. 1997) (holding that a defendant's consent to search was involuntary because it immediately followed an illegal seizure); *see also United States v. Valencia*, 913 F.2d 378, 382 (7th Cir. 1990) ("If the agents illegally seized Valencia, the illegal seizure would have tainted his subsequent consent, since his consent presumably was the product of his detention.").

There is no question that Ahmad expressly consented to the search of the RV as well as the external dog sniff. He contests the voluntariness of that consent, arguing that he was unlawfully seized at the time he gave it. The question, then, is whether a seizure occurred *before* Suttles asked him for permission to search, vitiating his consent.

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick,* 501 U.S. 429, 434 (1991). "[A] person has been 'seized' within the meaning of the Fourth Amendment … only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). If a reasonable person would feel free "to disregard the police and go about his business," no seizure has occurred. *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

The "reasonable person" metric is an objective standard, so Ahmad's subjective state of mind is irrelevant. *Estate of Perry v. Wenzel*, 872 F.3d 439, 457 (7th Cir. 2017). "Determin-

ing whether a seizure has occurred is a highly fact-bound inquiry," but a number of circumstances may be relevant, including: whether the encounter occurred in a public place or the police moved the person to a private location; whether the officer told the person that he was free to leave; whether the police limited the person's movement via physical touching, restraint, or other coercive conduct; whether the officer informed the person that he was the target of an investigation; and whether the person was deprived of identification or other vital documents "without which he could not leave." *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008). Other relevant factors include whether there was a "threatening presence of several officers and a display of weapons" and "whether the officers' tone of voice was such that their requests would likely be obeyed." *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015) (quoting *United States v. Johnson*, 680 F.3d 966, 975 n.4 (7th Cir. 2012)); *see also United States v. McCarthur*, 6 F.3d 1270, 1276 (7th Cir. 1993); *United States v. Adebayo*, 985 F.2d 1333, 1338 (7th Cir. 1993).

We agree with the district judge that Ahmad's encounter with Deputy Suttles was consensual and did not become a seizure until the dog alerted and he and Usama were detained while the RV was searched. To begin, the entire encounter—from Deputy Suttles's initial questioning to Ahmad's eventual arrest—occurred in a public place, a truck-stop parking lot. Suttles spoke in normal, conversational tones and made no verbal commands; he never raised his voice or used a hostile tone. Ahmad was not physically touched, and his movement was not otherwise constrained. There was neither a "threatening presence of several officers" nor a "display of weapons." *Shields*, 789 F.3d at 743 (quotation marks omitted). Suttles was the only officer on

the scene until Trooper Adams arrived with the drug dog—by which time Ahmad had already consented to the search—and Suttles never drew his weapon. Perhaps most importantly, Suttles informed Ahmad that he was free to leave and never indicated otherwise until after the dog alerted. These factors weigh heavily against a finding of seizure.

That leaves the most strenuously contested circumstance in the case: the effect of the deputy's possession of Ahmad's driver's license and rental agreement, "documents without which he could not leave." *Tyler*, 512 F.3d at 410. Ahmad urges us to hold that a seizure occurred when he handed Suttles his driver's license and the RV rental agreement. He analogizes his situation to two other cases in which we have held that an officer's retention of a suspect's ID amounted to a seizure: *Tyler* and *United States v. Cordell*, 723 F.2d 1283 (7th Cir. 1983). The analogy doesn't hold in either case, but the analysis requires a bit of unpacking because of the highly fact-intensive nature of the inquiry.

In the first of these cases, two police officers approached Earkle Tyler as he was walking down the street carrying an open beer bottle. *Tyler*, 512 F.3d at 408. The officers told Tyler that he was violating an open-container law. (They were mistaken, but that fact had no effect on our seizure analysis.) The officers asked Tyler for his identification, and when he turned it over, they began a warrant check and told him that he could not leave until they completed their check of his record. *Id.* at 410. This combination of circumstances, we said, amounted to a seizure:

> A reasonable person would not feel free to walk away after being confronted by two po-

lice officers and told he was committing a crime in the officers' presence. Moreover, the officers retained Tyler's identification while they ran a warrant check and told him he could not leave until the check was completed. Under these circumstances, a reasonable person would have believed he was obliged to stay put.

*Id.* at 410–11.

*Tyler* is easily distinguishable. The officers told the defendant that he was violating the law in their presence and that he was not free to leave until they completed their warrant check. Those circumstances are missing here. Ahmad was told that he was free to leave at any time, and Suttles never expressly accused him of any illegal activity.

Ahmad's second case is *Cordell*. There two officers on narcotics duty at O'Hare International Airport were monitoring an inbound flight from Miami, "a known 'source' city for narcotics." *Cordell*, 723 F.2d at 1284. They observed Kelly Cordell deplane from the flight and proceed at a "very rapid pace" through the terminal. *Id.* The officers approached, identified themselves, and asked to speak with him. Cordell agreed but appeared very nervous. The officers asked to see his ID, and he gave them his Wisconsin driver's license. They then asked to see his airline ticket, and he produced a ticket purchased with cash in the name of P. Baldwin. *Id.* After receiving these contradictory documents, the agents explained that they were "conducting a narcotics investigation" and asked to search Cordell's bag. *Id.* He consented, and the officers discovered 240 grams of cocaine.

Cordell was indicted for possessing cocaine with intent to deliver. He moved to suppress the drugs, but the district court denied the motion. Cordell challenged that ruling on appeal, arguing that his consent to search his bag was involuntary because he was illegally seized when he gave it. We first observed that the officers "were doing nothing that could be construed as a Fourth Amendment seizure" when they merely "identified themselves as police officers, asked Cordell if he would speak to them, and requested his identification and airline ticket." *Id.* at 1285. But when the officers took possession of Cordell's identification and "told [him] they were conducting a narcotics investigation, the encounter … [became] a detention." *Id.* By then, however, they had developed reasonable suspicion to support a detention, so we affirmed the denial of suppression. *Id.*

Ahmad reads *Cordell* as holding that a consensual encounter with an officer necessarily becomes a seizure as soon as the officer takes possession of the person's identification. We disagree. First, as a general matter, the "totality of the circumstances" inquiry is too fact specific to yield a rigid rule. And later cases undercut any categorical understanding of *Cordell*. For example, in *United States v. Soto-Lopez*, 995 F.2d 694 (7th Cir. 1993), we addressed another airport narcotics-monitoring investigation like the one in *Cordell*. There a DEA agent and a Chicago police officer were working drug interdiction at O'Hare monitoring inbound flights from "source cities," including San Jose, California. Jose Soto-Lopez arrived on a flight from San Jose; as he made his way from the gate, the officers approached him. They identified themselves and asked him if he would answer a few questions. They told Soto-Lopez that he was not under arrest and was free to leave. *Id.* at 696.

Soto-Lopez agreed to talk to the officers, and he produced his airline ticket, driver's license, and resident-alien card at their request. *Id.* The agents briefly retained the documents while they conducted the interview, with one officer reading the information on the documents out loud so the other could write it down while they were talking. *Id.* Soto-Lopez denied that he was transporting drugs but appeared nervous. He gave the officers permission to search his carry-on bag but denied having other luggage. When the search of the carry-on bag turned up nothing, the officers let him "proceed on his way" but followed him to baggage claim where they watched as he waited there with another man before leaving without collecting any additional luggage. *Id.* at 697. A search of his left-behind checked bag revealed 10 kilos of cocaine, and he was later arrested. *Id.*

We held that the officers' encounter with Soto-Lopez was consensual and did not "escalate" to a seizure when the officers briefly retained his identification and other documents while the interview was underway. *Id.* at 698. We explained that the defendant "was not deprived of his ticket or identification for an unusual length of time, nor was he taken to an isolated area while the agents had his documents." *Id.*

*Soto-Lopez* makes clear that an officer's retention of a suspect's identification does not *necessarily* transform an otherwise consensual encounter into a seizure. What's important is *how long* and *under what circumstances* the suspect's identification documents were retained. Here, Suttles held Ahmad's driver's license and the RV rental agreement for only a few minutes before Ahmad consented to the search, hardly an "unusual length of time." And when weighed in

the balance with all of the other circumstances that we've mentioned, the deputy's brief retention of Ahmad's documents did not transform this otherwise consensual encounter into a seizure. Ahmad's consent to the search of the RV was therefore voluntary. The judge properly denied the suppression motion.

AFFIRMED