J-S46037-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH RIVERA, | : | |
| | : | |
| Appellant. | : | No. 2245 EDA 2017 |

Appeal from the Judgment of Sentence, July 6, 2017,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s): CP-51-CR-0008450-2016.

BEFORE: BOWES, J., SHOGAN, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.: **FILED OCTOBER 02, 2018**

Joseph Rivera appeals from the judgment of sentence imposed after a bench trial where he was convicted of various firearm charges.[1] In his sole issue raised on appeal, Rivera challenges the trial court's denial of his suppression motion. After careful review, we affirm.

The trial court summarized the relevant facts as follows:

On August 5, 2016, at about 9:00 p.m., Philadelphia Police Officer John Seigafuse received a telephone call from a person he knew by name[,] who told him that there were three males standing on the corner of Glenwood Avenue and 6th Street armed with handguns. Included in that information was the following description of the males:

The first one was a Hispanic male wearing a white polo shirt and jeans. The second was a Hispanic male with a

---

[1] 18 Pa.C.S.A. §§ 6105, 6106, and 6108.

beard wearing a black t-shirt and jeans. The third was a Hispanic male with a gray t-shirt and blue jeans.

Officer Seigafuse and other officers, including Officer Jonathan Czapor, went to that location in two police cars, arriving at about 9:15 p.m. Upon arrival, they immediately saw three males that fit the above description given to Officer Seigafuse. The officers were in plain clothes and did not activate the lights and sirens on their vehicles upon arrival.

Upon arrival, one of the police cars stopped ahead of where the males were standing and the other pulled behind the males' location approximately twenty feet away. Officers Czapor and Seigafuse exited their vehicle simultaneously with the other officers and they all approached the three males. Upon approach, "two of the males, the one with the big, black beard and black t-shirt and the other male with the white polo shirt, … immediately looked in [Officer Czapor's] direction and both of them put their hands up above their heads."

According to Officer Czapor, the third male, ([Rivera] herein) who was wearing a grey t-shirt and blue jeans, did a 180. There was a fence behind him and as soon as he turned around, he went down, put his head down and immediately put his hands towards the front right side of [his] waistband. It appeared he was so focused on his waistband that he actually walked into the chain-link fence that was behind him at that time.

After [Rivera] walked into the fence, Officer Czapor was forced to physically restrain him because he made a move toward his waistband and the officer could not see [Rivera's] hands. The officer conducted a pat-down of [Rivera's] waistband and immediately felt a handgun. As the other officers restrained [Rivera], Officer Czapor recovered the handgun, which later examination revealed was both loaded and operable.

Officer Czapor, a police officer for sixteen years, had recovered guns and narcotics on multiple occasions in the area where [Rivera] was apprehended. He further testified that is was a high traffic drug area. Finally, [Rivera] did not have a license to carry a firearm and had prior convictions rendering him ineligible to possess a firearm.

Trial Court Opinion, 11/16/17, at 2-3 (citations and footnotes omitted).

On March 13, 2017, Rivera filed a motion to suppress physical evidence, including his statements to the police, and the gun found on his person. Within his motion, Rivera averred that he was arrested without probable cause, he was subjected to a stop and frisk on less than reasonable suspicion, and he was arrested without a lawfully issued warrant or other legal justification. Rivera further averred the police conducted the search without probable cause. Omnibus Motion, 3/13/17 at 2.

The trial court held an evidentiary hearing on April 6, 2017. Both Officer Czapor and Officer Seigafuse testified. The trial court ultimately denied Rivera's motion. On May 1, 2017, following a stipulated waiver trial, the court found Rivera guilty of all charges. The trial court imposed an aggregate sentence of 5 to 10 years' incarceration. This appeal follows. Both the trial court and Rivera have complied with Pa.R.A.P. 1925.

Rivera presents the following issue for our review:

1. Did not the [trial] court err by denying [Rivera's] motion to suppress the physical evidence and by characterizing [Rivera's] first contact with police as a "mere encounter," where two cars carrying five or six police officers pulled up behind and in front of [Rivera], who was standing on a street corner with two other Hispanic men; where officers got out of the cars and approached from either side, causing the other men to put their hands up in the air; where officers characterized the interaction as a "stop"; and where officers prevented [Rivera] from walking away?"

Rivera's Brief at 3.

Our scope of review is limited to the testimony and other evidence presented at the suppression hearing. *See generally*, *In re L.J.*, 79 A.3d 1073 (Pa. 2013). Because the Commonwealth prevailed on this issue in the suppression court, we consider "only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Commonwealth v. Johnson*, 33 A.3d 122, 124 (Pa. Super. 2011). Our review of the suppression-hearing transcript supports the trial court's factual findings.

Next, we must determine whether the trial court's legal conclusions are correct. The trial court reasoned:

> Here, there was no evidence presented during the suppression hearing indicating that when the officers approached [Rivera] and the other two males, they made any showing of physical force or display of authority. The officers did not have weapons drawn and there is no evidence that they blocked [Rivera's] path or restricted his freedom of movement in any significant way. Importantly, they did not tell [Rivera] that he was not free to leave. Thus, this Court's ruling that this was a mere encounter is consistent with the applicable law and should not be disturbed. *See, e.g., In Interest of Jermaine*, 582 A.2d 1058, 1061 (Pa. Super. 1990) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.") (citations omitted). *Accord Florida v. Royer*, 460 U.S. 491, 496 (1983) ("law enforcement officers do not violate the Fourth

- 4 -

Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen").

Even if [Rivera] was subjected to an investigative detention when the police exited their vehicles, suppression still was not warranted. [Rivera] and the other two males were in the precise location stated by the person who supplied the information to police and the males were garbed exactly as described by the caller. The fact that [Rivera] and the others fit the description of the males described in the telephone call permitted the experienced officers, in a high crime area, to investigate and to briefly detain them for questioning. The law is well settled that a tip may give rise to reasonable suspicion if it has the requisite indicia of reliability, which may include corroboration by police observation. ***Navarette v. California***, 134 S. Ct. 1683, 1688-1692 (2014); ***Alabama v. White***, 496 U.S. 325, 329 (1990); ***Adams v. Williams***, 407 U.S. 143, 146-47 (1972). ***Accord Commonwealth v. Zhahir***, 751 A.2d 1153, 1157 (Pa. 2000); ***In Re D.M.***, 781 A.2d 1161, 1165 (Pa. 2001), ***Commonwealth v. Korenkiewicz***, 743 A.2d 958, 964 (Pa. Super. 1999) (*en banc*). Such corroboration occurred here when the police arrived and observed [Rivera] and the other two males, matched the description, in the precise location described in the telephone call received mere minutes earlier. Moreover, no one else present in the area matched the description of the three males. Thus, the fully corroborated report provided reasonable suspicion to investigate the males further.

Finally, [Rivera's] acts upon seeing the police officers who, as noted above, did nothing to convey they were not free to leave, gave the officers grounds to detain and frisk [Rivera]. Officer Czapor stated that [Rivera] suddenly turned to a fence, secreting his hands from the officers' view, while immediately reaching for his waistband. These actions immediately caused the officer to fear that [Rivera] was armed and potentially dangerous.

Trial Court Opinion, 11/16/17, at 6-7.

- 5 -

As we will discuss in detail below, we disagree with the trial court's conclusion that law enforcement's initial interaction with Rivera was a mere encounter. However, we agree that the totality of the circumstances justified a valid investigative detention. As such, we conclude that the policemen's search of Rivera was constitutional and the trial court properly denied Rivera's motion to suppress.

In his first argument, Rivera contends that "the trial court erred by characterizing the policemen's initial approach as a 'mere encounter'." Rivera's Brief at 9. Rivera points to multiple facts to support this contention. First, he avers that "[f]ive or six officers in two police cars all descended together" upon him and the two other men. *Id.* Rivera points out that the police approached him and the other males from both sides, and that "they took out their badges from around their necks as they approached." *Id*. Finally, Rivera argues that the other two men raised their hands above their heads as the officers approached, objectively demonstrates a seizure occurred. According to Rivera, "[u]nder all the circumstances surrounding this initial police approach, a reasonable person would not believe he was free to leave." *Id.* at 10. We agree with this part of Rivera's argument.

"The Fourth Amendment of the Federal Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures." *Commonwealth v. Walls*, 53 A.3d 889, 892 (Pa. Super. 2012). Once a criminal defendant files a motion to suppress evidence, it is the Commonwealth's burden to prove, by a

- 6 -

preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights. *Commonwealth v. Simonson*, 148 A.3d 792, 796 (Pa. Super. 2016).

Appellate courts in Pennsylvania "have long recognized that there are three levels of intrusion involved in interaction between members of the public and police." *Walls*, 53 A.3d at 892. This Court has compared and contrasted these levels of interaction as follows:

> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of the citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>
> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Commonwealth v. Coleman*, 19 A.3d 1111, 1115-16 (Pa. Super. 2011) (citations omitted).

We begin our review with the first inquiry focusing on whether Rivera was "seized" during the initial interaction with Officer Czapor, Officer Seigafuse, and the three to four additional responding officers. In determining whether a valid seizure has occurred, we evaluate all of the surrounding

circumstances through an objective lens to ascertain whether a reasonable person would feel that he was free to leave. ***Commonwealth v. Strickler***, 757 A.2d 884, 889 (Pa. 2000).

> In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

***Id.*** at 890 (citation and footnote omitted).

Rivera contends that the initial approach and interaction by the police exceeded the scope of a mere encounter. The Commonwealth argues that the "police approached [Rivera] without activating lights or sirens, touching defendant or restraining his movements in any way, displaying weapons, or saying anything." Commonwealth's Brief at 8. The Commonwealth relies on this Court's decision in ***Commonwealth v. Byrd***, 987 A.2d 786 (Pa. Super. 2009) in support of its argument.

In ***Byrd***, the trial court granted the appellant's motion to suppress, finding that the appellant abandoned contraband due to an "unlawful show of force" when the appellant discarded a gun after spotting three to five police cars travelling the wrong way down a one way street. ***Id.*** at 792. This Court reversed, concluding that "appellee was not deprived of his freedom in any significant way nor could he reasonably believe that his freedom of action was being restricted by police conduct prior to abandoning the handgun." ***Id.*** at 793. This Court noted that the neither the cruisers' sirens nor lights were on,

but perhaps, more importantly, there was "no evidence that the police showed any interest in appellee…" *Id.* Additionally, the police vehicles were 50 to 60 feet away when the appellee abandoned his gun. *Id.*

Here, the police *were* specifically interested in Rivera and the two other men with him. The police drove to that particular location with particularized intent to find them. Although, the lights and sirens were not activated in the police cars, Officer Seigafuse testified that the two police vehicles were parked in a manner that "boxed [Rivera and the other two men] in," and that he and the other four to five police officers approached Rivera from the front and the back. N.T., 4/6/2017, at 20. Given the orientation of the police vehicles and the formation in which the officers approached Rivera, it is clear that a reasonable person would feel that their movement had been restricted and that they were not free to leave. Additionally, during his testimony, Officer Seigafuse referred to the initial encounter with Rivera and the other two suspects as a "stop." *Id.* at 20.

Citing **Commonwealth v. Baldwin**, 147 A.3d 1200, 1203 (Pa. Super. 2016), the Commonwealth emphasizes that "the focal point of the inquiry is whether a reasonable innocent person would have felt restrained under the circumstances." Commonwealth's Brief at 10. In **Baldwin**, as in Rivera's case, the police did not activate sirens or lights. However, this Court pointed to another circumstance present in **Baldwin** that is absent here; "the officers did not block [Baldwin's] path…" *Id.* at 1204. By parking two vehicles from the front and from behind the men, and in addition to the five to six officers

approaching from either side, Rivera's path was effectively blocked. As such, under a totality of the circumstances analysis, the facts in **Baldwin** are readily distinguishable from the facts in Rivera's case.

The Commonwealth also discounts the fact that the other two men with Rivera raised their hands above their heads, and denies this was evidence a seizure occurred. The Commonwealth argues that police officers may approach citizens on the street, **Commonwealth v. Lyles**, 97 A.3d 298, 303 (Pa. 2014), and the men's reaction was a product "of their own fear of detection and not because of any coercion or restriction by police." Commonwealth's Brief at 10. We disagree. As noted above, the manner in which the police surrounded and approached the men, indicates Rivera was not free to leave. The fact that the other two men reflexively raised up their hands adds weight to the conclusion a seizure occurred.

Viewing the totality of the circumstance, we determine that the officers exercised a sufficient show of authority to warrant a reasonable man to conclude they were attempting a forcible stop. Thus, our review of the record indicates this was more than a mere encounter.

We now turn our analysis to whether reasonable suspicion existed to subject Rivera to a valid **Terry** stop. Rivera contends that the information Officer Seigafuse received from a known informant fell short of establishing sufficient reasonable suspicion to initiate a stop. Rivera asserts that:

> While the source had supplied information to Officer Seigafuse in the past, the extent and basis of this information was never divulged. Officer Seigafuse did not have the current address of

- 10 -

the tipster. Nor was there any way for defense counsel to test the basis or reliability of the past information the tipster had provided Officer Seigafuse.

Rivera's Brief at 14-15 (citations omitted).

Rivera suggests that these aforementioned facts (or lack thereof) render the tip from Officer Seigafuse's known source unreliable. We disagree. In **Commonwealth v. Brown**, 996 A.2d 473 (Pa. 2010), our Supreme Court rejected a similar argument which would require the Commonwealth to provide a detailed history of a known informant's tips to establish the tipster's reliability. The Court held that listing an informant's history such as, the number of times the informant was used, the number of times arrests were made based on that information, and the number of convictions as a result, is one way to prove reliability, but not the sole way. **Id.** at 478. The Court stated that "[t]he constitutional test requires sufficient suspicion but . . . does not delineate specific details that must be listed like a recipe in order to give rise to that suspicion." **Id.** Therefore, Rivera's assertion that the Commonwealth was obliged to divulge the "extent and basis" of the informant's past tips is without merit. Additionally, Rivera cited no authority that requires an officer to know an informant's current address to qualify the informant as a reliable source. Similarly, Rivera has cited no authority to support his argument that defense counsel must have an opportunity to cross check the informant's reliability. Likewise, we are unaware of any such precedent.

"To have reasonable suspicion, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including 'tips' from citizens." ***Commonwealth v. Lohr***, 715 A.2d 459, 461 (Pa. Super. 1998). With respect to these third-party "tips," we have held:

> Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors — quantity and quality — are considered in the "totality of the circumstances — the whole picture," that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were reliable.
>
> When the underlying source of the officer's information is an anonymous call, the tip should be treated with particular suspicion. However, a tip from an informer known to the police may carry enough indicia or reliability for the police to conduct an investigatory stop, even though the same tip from an anonymous informant would likely not have done so.
>
> Indeed, identified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk. When an identified third party provides information to the police, we must examine the specificity and reliability of the information provided. The information supplied by the informant must be specific enough to support reasonable suspicion that criminal activity is occurring. To determine whether the information provided is sufficient, we assess the information under the totality of the circumstances. The informer's reliability, veracity, and basis of knowledge are all relevant factors in this analysis.

*Commonwealth v. Barber*, 889 A.2d 587, 593-594 (Pa. Super. 2005) (internal quotations and citations omitted).

Rivera relies on this Court's decision in *Commonwealth v. Jones*, 845 A.2d 821 (Pa. Super. 2008), where we held that no reasonable suspicion existed when a police officer stopped the defendant's vehicle based on a named individual's complaint. In *Jones*, the officer was notified that a vehicle matching the description and license plate number of the defendant's was involved in drug activity. In that case, the officer only knew the name of the informant through the dispatcher. The officer did not know where the tip had come from or of the reliability of the source, because he had no prior history with the tipster. Additionally, no description was given regarding the people in the car or any specificity as to the type of "drug activity" occurring. As such, the tip "did not contain sufficient specificity to justify the detention…" *Id*. at 826.

Rivera's case is easily distinguishable from *Jones*. Here, the informant had provided Officer Seigafuse with reliable information on numerous occasions over the course of a year resulting in multiple arrests. The tip also provided specific information, including the number of men, their race, facial descriptions, the clothing they were wearing, and the precise location where then men were standing.

Rivera's reliance on *Commonwealth v. Allen*, 725 A.2d 737 (Pa. 1999) is also misplaced. In that case, a police officer received a tip from a retired police lieutenant. The vague tip generally described a man who was selling

drugs at a certain residence. *Id.* at 740. Our Supreme Court held that the officer "did not possess sufficient information to raise a reasonable suspicion that appellant was *currently* engaged in criminal activity." *Id*. (emphasis added). In contrast, here, the tipster provided a detailed description of the men, and reported that they were, at that instant, standing at a given location with guns.

Finally, Rivera argues that the police failed to corroborate the informant's tip because they did not set up surveillance in order to observe Rivera engage in suspicious conduct. Rivera's Brief at 15. We reject this argument. First, the police corroborated nearly every detail of the informant's tip when they drove to the specified location and observed three men matching the exact description the tipster provided.[2] Second, this argument that the police failed to survey Rivera is a red herring. In **Brown**, our Supreme Court aptly summarized a similar factual situation:

_____

[2] In **Draper v. United States**, 358 U.S. 307 (1959), a paid informant who had a history of accuracy and reliability, told the agent that the defendant would be arriving in Denver on a train from Chicago, and would be in possession of heroin. The informant described the defendant's physical attributes and mannerisms. The officer observed a man matching the informant's description exiting from the train reported. The Supreme Court of the United States held that the agent independently corroborated every facet of the tip which established "reasonable grounds" for the officer to believe that the unproved information regarding the heroin was also true. As such, the agent had probable cause to believe the defendant was engaged in illegal activity. As in **Draper**, Officer Seigafuse's informant told him of specified individuals, engaged in specific crimes at a specific time and location, and the officers corroborated the personal information to approximately the same extent as in **Draper**.

> *The question involves credibility of the one person who called police*. The informant in this case was not anonymous, and the tip consisted of more than mere description. The informant provided police with information regarding imminent criminal activity committed by a specific person at a particular time and place. These facts, provided by a source known to police and corroborated through police investigation certainly gave rise to reasonable suspicion sufficient to warrant an investigative detention.

**Brown**, 996 A.2d 473, 479 (Pa. 2010) (emphasis added).

In sum, we conclude that the initial interaction between Rivera and the police constituted more than a mere encounter. However, because the known informant had a track record of reliability, and the officers corroborated the information that the tipster provided, the totality of the circumstances established sufficient reasonable suspicion to conduct a lawful investigative detention.[3]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/2/18

---

[3] Rivera does not dispute that once he turned to flee and reached for his waistband, police had reasonable suspicion to justify a frisk of weapons. **See** Rivera's Brief at 11. An officer may conduct a pat-down "if the officer possesses reasonable suspicion that the person may be armed and dangerous." **Commonwealth v. Thomas**, 179 A.3d 77, 83 (Pa. Super. 2018) (citation omitted).